Filed 4/2/24  Jinkins v. Sharpe CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ANNABELLE JINKINS, | H050098 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 18PR184370) |
| v. | |
| NORINA SHARPE, as Trustee, etc., | |
| Defendant and Appellant. | |

In this matter, siblings dispute the treatment of a family trust.  Husband and wife settlors Rafael and Asuncion Liberato made their four children equal beneficiaries of their family trust.[1]  Twenty years later, after the death of Rafael and estrangement of the two younger siblings, the eldest daughters assisted their elderly mother in amending the survivor's trust.  The amendments benefited the eldest daughters to the detriment of the younger siblings.  When the eldest daughter died, those benefits accrued to the second eldest daughter, Norina Sharpe, who became the trustee and helped Asuncion manage her finances and health care until her death.

---

[1] For clarity, we refer to the parties and other family members by their first names as they appear in the briefs and record.  (See, e.g., *In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 550, fn. 2.)

After Asuncion's death, the youngest daughter, Annabelle Jinkins, filed petitions challenging the validity of the trust amendments and seeking to remove Norina as trustee. Annabelle asserted claims against Norina of undue influence, elder financial abuse, and misappropriation of trust assets. Norina countered with a petition to enforce the trust's no contest clause against Annabelle, and to hold Annabelle liable under a surcharge provision for costs and attorney fees. Norina later amended her petition to add their brother, Sandy Liberato, as a defendant.

After a bench trial, the trial court rejected all parties' claims. The court held that the trust amendments were valid and rejected the trust contest, elder financial abuse, and misappropriation claims. Nevertheless, the court found that Annabelle had probable cause to file the trust contest, rejected Norina's no contest petition, denied her request to disinherit Annabelle and Sandy, and declined to surcharge their trust shares for attorney fees and costs. Norina and Annabelle each appeal the judgment.

We conclude Annabelle has not carried her burden on appeal of demonstrating that the trial court erred in denying her claims of undue influence, elder financial abuse, and for removal of the trustee. We also decide that Norina has not carried her burden on appeal of showing the court erred in rejecting her defense of laches to the trust contest and in denying her petition to enforce the no contest clause and for surcharge against Annabelle and Sandy.

We therefore affirm the judgment.

2

## I.  FACTS AND PROCEDURAL BACKGROUND

*A. Facts*[2]

### 1.  Liberato Family Trust

Rafael and Asuncion Liberato married in 1952 in the Philippines and had four children—Carolina Liberato, Norina Sharpe, Annabelle Jinkins, and Sandy Liberato. Rafael and Asuncion moved to California in 1969.  During their marriage, they acquired property in California and the Philippines.  In 1994, Rafael and Asuncion established the Liberato Family Trust (the trust).  They made their children equal beneficiaries under the trust.  The trust named Carolina and Norina as successor trustees and contained a no contest clause.

Rafael died in 2001.  The trust property was divided between Asuncion's share as surviving spouse (survivor's trust) and Rafael's remaining share, which was placed into an irrevocable bypass trust (bypass trust).[3]  Carolina prepared the division of trust assets between the survivor's trust and the bypass trust.  After Rafael's funeral, Sandy ceased all contact with Asuncion, Norina, and Carolina, though Annabelle kept in touch with him.

### 2.  Management of Trust Assets

Shortly after Rafael's death, Asuncion signed a durable power of attorney naming Carolina as her attorney in fact and Norina as the alternate.  Asuncion entrusted Carolina

---

[2] The factual background is drawn from the trial court's final written statement of decision, the trial testimony, and the record on appeal.  "We recite the essential relevant facts 'in the manner most favorable to the judgment, resolving all conflicts and drawing all inferences in favor of respondent.' " (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1233, fn. 2.)  We describe conflicting evidence where relevant to each side's contentions regarding the sufficiency of the evidence to support the claims in the appeal and cross-appeal.

[3] A bypass trust makes the deceased spouse's assets "available for the surviving spouse's use but does not give the surviving spouse rights to the property in the bypass trust that would cause any of the undistributed trust property to be included in the taxable estate of the surviving spouse upon his or her death." (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 416 (*Donkin*), citing Int. Rev. Code, § 2041.)

to help manage the family's assets after Rafael's death. Asuncion sought to sell family property in the Philippines that had been titled in Rafael's name. Asuncion asked her children to quitclaim their interest in the property so she could sell it and move the proceeds to California. Annabelle declined to sign the quitclaim and expressed concerns about the management of Rafael's investment funds.

The disagreement strained Annabelle's relationships with her sisters and mother. Annabelle and her husband Larry Jinkins engaged a family counselor to resolve the conflict. Annabelle proposed to her mother and sisters that Anabelle would quitclaim her interest in the Philippines property if they agreed to a set of written terms for Asuncion's financial decisions and related communications with her children. Among other provisions, the agreement would have required Asuncion to consult annually with a certified financial planner—selected and agreed to by her and all four children—and to refrain from disclosing financial information only to one child, instead requiring any financial discussion to occur with all three daughters and later summarized to Sandy by mail. Asuncion did not agree to Annabelle's terms, and the discussions with the counselor did not resolve the family disagreements.

Annabelle and Sandy were not present when their sisters and Asuncion read Rafael's will. Annabelle did not receive a copy of the trust, though she requested it many times. In 2002, she hired legal counsel to try to obtain a copy of the trust documents. Her counsel was unsuccessful, and Annabelle did not receive a copy of the trust until May 2018, after Asuncion's death.

Annabelle decided she needed to break off contact to remover herself from what she describes as her sisters' abusive behavior toward her. She did not inform Asuncion of this decision. Annabelle felt she had already explained her position to her mother and believed her mother was under her sisters' "complete control."

From approximately May 2002 to October 2016, Annabelle had no contact with Asuncion, Norina, or Carolina, apart from a chance meeting with Asuncion in 2009. In

4

December 2002, Annabelle received a typewritten letter from Asuncion. The letter responded to correspondence from Annabelle's attorney to Carolina. The letter expressed Asuncion's frustration with Annabelle's resort to attorneys to correspond with Carolina and Annabelle's failure to respond to Asuncion's phone calls. The letter stated that Asuncion would "do what it takes to mitigate and minimize [Annabelle's] impact" on the family and the estate, "and to live the rest of my life peacefully without any legal harassment." Though signed by Asuncion, based on the language and tone of the letter, Annabelle believed it had been written and signed by Carolina or Norina.[4]

Asuncion opened an annuities account in or about 2003 that listed Carolina and Norina as the designated beneficiaries. In February 2004, Asuncion executed a handwritten will in which she devised her personal property to Carolina, Norina, and her grandchildren.[5] Asuncion expressed her intent to not leave any personal effects to Annabelle or Sandy because of their failure to communicate with her and because Annabelle already "has enough money and jewelry of her own." Asuncion's granddaughter Sarah Sharpe, who lived with Asuncion for three years immediately after Rafael's death, testified that Asuncion had grown angry with Annabelle's refusal to talk to her and told friends and family that "if she won't talk to me, then she won't get anything of mine."

In 2012 or 2013, Asuncion began to consider making changes to the survivor's trust. In 2013, Norina helped Asuncion arrange a meeting with counsel to update her estate planning documents. Asuncion retained a firm's legal services in October 2014. Norina accompanied Asuncion to several meetings with her estate planning counsel between 2014 and 2015. Asuncion also decided in 2014, after a few incidents in which

---

[4] Norina testified at trial that she had typed the letter for Asuncion after Annabelle refused to answer Asuncion's phone calls or return her voice messages.

[5] Asuncion specified her four grandchildren (Norina's three children and Sandy's son). She included Sandy's son "equally" in the distribution of jewelry and furniture on condition that he not sell them and pass them on to his children as a family heirloom.

she left a pot cooking on the stove or mixed up medications, to move out of her house for safety reasons related to her forgetfulness. Dr. Yuka Yonebayashi, Asuncion's regular physician, examined Asuncion in June 2014 and diagnosed her with cognitive impairment. Dr. Yonebayashi saw Asuncion again in September 2014 and noted that Asuncion's physical health was stable and she was " 'able to answer value questions appropriately, and with [the] help of family, c[ould] make her wishes clear.' "

By November 2014, Asuncion was living in an assisted living facility. At that time, a claim for long-term care reimbursement benefits was made against Asuncion's long-term care policy administered by Genworth Life Insurance Company (Genworth). A registered nurse working for Genworth assessed Asuncion in November 2014 for the long-term care claim and noted, based on the information provided by Norina at the assessment, that Asuncion was suffering cognitive impairment or " 'memory loss.' " In a subsequent July 2015 assessment, Norina reported Asuncion's diagnosis to the Genworth nurse as Alzheimer's, with an onset date of September 2014. Genworth accepted the claim, backdated to August 11, 2014, based on Asuncion's reported condition of "Dementia (Alzheimer's, Senility, All Others)." (Some capitalization omitted.) The long-term care policy thereafter reimbursed Asuncion for the costs of her nursing home care.

### 3. 2015 Restatement and First Amendment

In January 2015, Asuncion revoked her survivor's trust and executed a first restatement, titled "First Restatement of the Survivor's Share created under the Liberato Family Trust known as the Liberato Family Survivor's Trust" (restatement). (Some capitalization omitted.) She simultaneously executed a pour-over will, titled "Last Will of Asuncion C. Liberato," and power of attorney, titled "Property Power of Attorney." (Some capitalization omitted.) These documents named Norina as executor, followed by Carolina and Asuncion's granddaughter Sarah, and invested Carolina with power of attorney, followed by Norina and Sarah.

6

The restatement changed the trustee provisions to nominate Norina as initial cotrustee with Asuncion, followed by Carolina and Sarah as successor trustees. The restatement altered the existing distributive provisions to give Carolina's share of the survivor's trust to Norina if Carolina predeceased Norina, but did not otherwise alter the equal distribution of the trust estate among the four children. The restatement included a detailed no contest provision, which directed the disinheritance of any person under the trust who takes specified actions, and further incorporated an exhibit that addressed indemnification of the trustee from costs caused by a "difficult" or " 'problem-causing' " beneficiary.

In April 2015, Norina and Asuncion jointly opened two pay-on-death (POD) accounts at Bank of America. Each account named Norina's personal living trust, the "David & Norina Sharpe Living Trust," as the pay-on-death beneficiary. (Some capitalization omitted.)

In June 2015, Asuncion filed a petition in the trial court seeking court approval to make further amendments to the survivor's trust and for orders regarding the status of residential property (the Printempo property) that Asuncion and Rafael helped Carolina purchase in 1994. Asuncion and Rafael had retained a 50 percent ownership interest in the Printempo property, but it had been omitted from the allocation of assets after Rafael's death. The petition was titled "petition for order instructing trustee re Printempo property and approval of amendment to survivor's trust" (capitalization omitted; hereafter, 2015 petition). Asuncion's counsel simultaneously filed a notice of hearing on the 2015 petition, indicating service of the petition and notice of hearing to the interested parties, including Annabelle and Sandy.

The 2015 petition requested court approval of a first amendment to the survivor's trust to change the distribution of trust assets. It included a declaration by Asuncion and two physician reports. Dr. Yonebayashi reported, based on a March 2015 examination, that Asuncion had "some age related forgetfulness" but had the capacity to make a will or

7

execute a trust. Dr. Thao Phan, who examined Asuncion in September 2014 and April 2015, similarly noted "some age related forgetfulness" but found her fully capable of understanding the nature of a will or trust and of making decisions regarding property and financial affairs.

The trial court granted Asuncion's 2015 petition. It found that notice of the hearing "ha[d] been given as required by law" and Asuncion was "legally competent and authorized to amend . . . the Liberato Family Survivor's Trust as set forth in the First Amendment." As a result, in August 2015, Asuncion executed the First Amendment to the First Restatement of the Survivor's Trust (first amendment). The first amendment altered the distribution of the survivor's trust among the children, increasing Norina's and Carolina's shares to 40 percent each and reducing Annabelle's and Sandy's shares to 10 percent each. Together, we refer to the restatement and first amendment as the 2015 trust amendments.

In September 2016, Carolina died after a sudden illness. Under the terms of the 2015 trust amendments, Norina became the beneficiary of Carolina's share of the survivor's trust and would receive 80 percent of the survivor's trust property upon Asuncion's death. Norina also assumed, as successor to Carolina, power-of-attorney for Asuncion.

Annabelle resumed contact with Asuncion after Carolina's death. Annabelle began visiting her mother in October 2016 and continued to do so until Asuncion's death. Annabelle did not ask Asuncion about estate planning or finances during her visits, as Asuncion was "checked out" and "wasn't at all capable of holding a conversation."

In December 2016, Norina took Asuncion for an evaluation at her care provider's memory clinic. The medical form submitted by Norina states that Asuncion had experienced " 'a gradual memory decline (forgetfulness)' " since approximately 2007. Norina also noted that she and Carolina had " '[taken] care of' " paying Asuncion's bills for the past 10 years. Dr. Phan diagnosed Asuncion in December 2016 with Alzheimer's

8

dementia.  Dr. Phan's December 2016 diagnosis appears to be the first time a medical provider gave Asuncion a clinical diagnosis of Alzheimer's dementia.

From December 26, 2016, until Asuncion's death in 2018, Norina deposited the Genworth long-term care reimbursement checks into the POD accounts.  Norina testified that the purpose of the POD accounts was to track the reimbursement checks and for Asuncion to have an account separate from the trust that she could use "outside of the rigid accounting requirements for the trust."  Norina transferred some of these funds, eventually totaling $95,501, to various accounts in the name of Norina's personal living trust, including two investment accounts, and to finance a real property purchase in Florida in 2017.

Asuncion died on January 1, 2018.

*B. Procedural History*

1.  Trust Contest, Removal Petition, and No Contest Petition

Following Asuncion's death, Norina and Annabelle communicated about the status of the bypass and survivor's trusts, and Annabelle received copies of the relevant trust documents.  Several months later, in September 2018, Annabelle filed a petition to compel accounting and to set aside the 2015 amendments to the trust.  Annabelle learned about the existence of the POD accounts sometime around February 2019 through a business records subpoena to Bank of America.  She amended the petition in December 2019 to add additional claims of elder financial abuse and to recover trust property under Probate Code section 850.[6]  We refer to Annabelle's petition and first amended petition as the trust contest.

Annabelle also filed a motion to vacate the prior court order granting Asuncion's 2015 petition on grounds of extrinsic fraud.  She argued that neither she nor Sandy had

_____

[6] Unspecified statutory references are to the Probate Code.

9

received notice of Asuncion's 2015 petition (related to the Printempo property and approval of the first amendment to the survivor's trust).

Annabelle's trust contest alleges, with respect to the survivor's trust, that as of 2010, Asuncion had become incapacitated, was not capable of handling her own finances or acting as trustee, and that medical records reveal Asuncion had received a clinical diagnosis of Alzheimer's dementia years before her death. Annabelle alleges that Norina and Carolina obtained the restatement and first amendment by fraud and undue influence, and that Annabelle never received notice of the hearing on the 2015 petition. The trust contest alleges unexplained losses of trust funds during the time Carolina and Norina oversaw trust finances, including approximately $250,000 in survivor's trust funds that Norina transferred to the POD accounts and failed to disclose in verified court filings.

The trust contest seeks to invalidate the estate documents executed by Asuncion in 2015, including the restatement and first amendment, and to require accountings of the bypass trust from 2001 to 2018 and the survivor's trust from 2010 to date. The trust contest seeks, among other relief, compensatory and special damages, costs, attorney fees, and exemplary damages.

Norina responded to the trust contest by filing as trustee a petition to enforce the no contest clause against Annabelle on the ground that she lacked probable cause to challenge the estate documents (no contest petition). The no contest petition seeks to disinherit Annabelle pursuant to the no contest clauses of the trust, restatement, and first amendment, and to hold her liable for costs and attorney fees. It alleges that Asuncion had included a robust no contest clause in the restatement, later reaffirmed in the first amendment, because she foresaw that Annabelle "was likely to cause difficulties."

Norina later filed a motion for leave to amend her no contest petition to add Sandy as a respondent after Annabelle filed a declaration by Sandy requesting that the court

10

invalidate the 2015 petition and order authorizing the first amendment to the trust. The court granted Norina's request.[7]

In 2019, Annabelle filed a separate petition to remove Norina as trustee of the bypass and survivor's trusts, appoint a private professional fiduciary as successor trustee, and receive compensatory and punitive damages (hereafter, removal petition). The removal petition alleges that discovery in the trust contest action revealed that Norina had breached her fiduciary duties, engaged in self-dealing as trustee, and violated the terms of the bypass and survivor's trusts.

### 2. Bench Trial

The probate court set the trust contest, removal, and no contest petitions for trial. It stated that proceedings on the petition for accounting would follow the trial on the other petitions.

In November 2021, the trial court held a 16-day bench trial on the petitions. The court rejected a motion in limine brought by Annabelle to dismiss Sandy as a party. The court entered a default judgment against Sandy based on his nonappearance at trial. Both sides presented evidence, including expert witnesses.

Annabelle's claims at trial included that Asuncion lacked mental capacity and was subject to undue influence in executing the 2015 trust amendments; that Norina committed elder financial abuse, engaged in self-dealing, and procured the 2015 trust amendments by fraud; that Norina misappropriated trust funds pursuant to section 850; and that Norina breached her fiduciary duties and should be removed as trustee. Norina's claims centered on Annabelle's lack of probable cause in bringing the trust contest, causing her disinheritance under the no contest provision. Norina further contended that both Annabelle and Sandy should be disinherited and surcharged (i.e., their shares in the

---

[7] We discuss the order permitting Norina to amend her petition, adding Sandy to the petition to enforce the no contest clause, and for surcharge, in more detail in our analysis, *post* (pt. II.G.1.).

11

trust estate reduced) for attorney fees and expenses caused by their actions in accordance with a provision of the restatement referred to as the "difficult beneficiaries" provision. Norina also asserted the affirmative defense of laches to the trust contest.

After the completion of Annabelle's case-in-chief, Norina moved for judgment pursuant to Code of Civil Procedure section 631.8. The trial court declined to render judgment until the close of all evidence. The court issued a final statement of decision after considering additional submissions by both sides, including extensive objections to the court's proposed statement of decision and judgment made by both Annabelle and Norina.

### 3. Statement of Decision and Judgment

In its statement of decision, the trial court rejected all claims. It denied Norina's motion for judgment based on Annabelle's prima facie showing in support of her claims and found the affirmative defense of laches inapplicable to the trust contest.

As to Annabelle's claims, the trial court found that Annabelle failed to show that Asuncion lacked the mental capacity to execute the 2015 trust amendments. It found the evidence of Asuncion's diminished mental capacity insufficient to establish incapacity by a preponderance of the evidence under the applicable legal standard.

The court similarly found the evidence insufficient to establish a presumption of undue influence. The court acknowledged that certain factors supported Annabelle's undue influence claim, including evidence of Asuncion's diminished capacity, her close and confidential relationship with Norina, and Norina's active participation in procuring the execution of the changes benefiting her. Nevertheless, the court concluded the evidence did not show that Asuncion's mental condition was such as to permit a subversion of her will, as required by the applicable statutory law defining undue influence in this context. (See Welf. & Inst. Code, § 15610.70, subd. (a); Prob. Code, § 86.) It found that, despite those circumstances consistent with undue influence, Annabelle had not demonstrated by clear and convincing evidence that the 2015 trust

12

amendments were inconsistent with Asuncion's voluntary actions or procured by undue influence.

The trial court also rejected Annabelle's fraud claim. It explained that while Annabelle cited certain transactions involving the POD accounts as evidence of Norina's intent to defraud Asuncion, there "is insufficient evidence before this court that the funds involved in the transactions were assets belonging to the trust." The court further noted that the joint POD accounts are not relevant to Asuncion's 2015 trust amendments, "but rather seem to indicate claims against Asuncion's estate–an issue not before the [c]ourt in this trial." Similarly with respect to Annabelle's misappropriation of assets claim pursuant to section 850, the court found there was insufficient evidence that the Genworth long term care insurance payments and POD account funds were trust assets. The court decided that whether the POD account transactions utilized trust fund assets is more appropriately determined "during the accounting hearing that was reserved for after the judgment in this trial."

The trial court concluded, given its findings on fraud and undue influence, that Annabelle had not met her burden by a preponderance of the evidence to prove her elder financial abuse claim. It further explained that Annabelle had not presented evidence showing that the transactions involving the POD accounts "were entered into against or contrary to Asuncion's will." Because Annabelle had not shown that Norina exercised undue influence or acted with fraudulent intent, the court reasoned that any hostility between the parties "does not rise to the level of impairing the administration of the trust." The court denied Annabelle's request to remove Norina as trustee and appoint a neutral third party administrator in her place.

The trial court also denied Norina's no contest petition to disinherit Annabelle and Sandy. It found, under the probable cause standard, that the evidence supported "a reasonable likelihood that the requested relief would be granted." The court noted the evidence that Asuncion's mental capacity had diminished, including based upon Dr.

13

Yonebayashi's observations of cognitive impairment in December 2014. It reasoned that Annabelle had a reasonable likelihood of prevailing on her allegations of undue influence and elder financial abuse based on the evidence that Norina had a close relationship with Asuncion, assisted in managing her health and financial affairs, and actively participated in preparing the 2015 trust amendments, which largely favored Norina's interests. The court further noted that, for "the same" reasons indicated, and despite Sandy's "admissions by default," it would not enforce the no contest provision against him.[8] The court also denied Norina's request to surcharge Annabelle and Sandy for attorney fees and costs but did not explain the basis for this conclusion.

In summary, the trial court found that Annabelle failed to meet her burden of proof on her claims, that the 2015 restatement and first amendment are valid, that Annabelle was properly served and the prior order on the 2015 petition cannot be overturned, and that Annabelle had probable cause to file the trust contest. The judgment entered by the trial court denied Annabelle's trust contest petition and request for removal of the trustee and denied Norina's no contest petition.

Annabelle and Norina each appeal the judgment.

## II. DISCUSSION

Annabelle raises multiple overlapping issues on appeal, which we distill into three claims. She contends that the trial court erred by failing to consider the evidence relating to the creation and use of the POD bank accounts, both with respect to her theory of undue influence and as evidence of her elder financial abuse claim. She also maintains the court improperly added an element to the requirements for proving elder financial abuse. Annabelle further asserts error in the trial court's decision to retain Norina as

---

[8] As discussed in more detail *post*, after amending her no contest petition to add Sandy as a respondent, Norina successfully moved to compel responses to discovery requests that she had served on Sandy and to deem admitted certain unanswered requests for admission.

trustee, arguing that Norina's undue influence, elder financial abuse, and various fiduciary breaches required her removal. Finally, Annabelle contends the court failed to address her claim that Norina engaged in self-dealing with a trust asset—specifically, an heirloom mirror—which Annabelle maintains is relevant to her breach of fiduciary duty and removal claim.

Norina disputes Annabelle's claims of error and raises four issues in her cross-appeal. She contends the trial court erred by finding Annabelle's trust contest and elder abuse claims were not barred by the equitable defense of laches. Norina asserts that the court erred by denying the no contest petition and erroneously assessed probable cause. Norina also maintains the court erred by not ordering a surcharge of Annabelle's and Sandy's beneficial interests in the trust based on the language of the restatement's " 'difficult beneficiary' " provision. She lastly claims the court failed to disinherit Sandy under the applicable no contest clauses based on the entry of default against him.

We address the issues in turn, beginning with the general principles and applicable standards of appellate review.

A. *General Principles and Standards of Appellate Review*

Although the applicable standard of review and governing legal principles necessarily vary for each issue, we are guided by the following general rules.

On appeal, we presume the judgment is correct. " 'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).) However, "[a] party may avoid implied findings in favor of a judgment, and preserve perceived error in a statement of decision, by making specific objections to the statement of decision." (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94; see *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*); Code Civ. Proc., §§ 632, 634.)

15

The parties in this case requested a proposed statement of decision, and each filed detailed objections to it. We therefore do not imply findings in favor of the judgment. Nevertheless, " '[t]he trial court is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' " (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983 (*Thompson*).) In other words, "though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings." (*Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525 (*Nunes*); accord *Thompson*, at p. 983.)

"Where the facts are undisputed, the effect or legal significance of those facts is a question of law." (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026 (*Gomez*); *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 (*Ghirardo*).) Where the facts are disputed, we review factual findings under the deferential substantial evidence standard. (*Ghirardo*, at p. 800; *Gomez*, at p. 1026.) And where the issue on appeal raises a mixed question of law and fact, the proper degree of deference varies based on the nature of the inquiry. (*Ghirardo*, at pp. 800–801; *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175 (*Connerly*).)

" ' "In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]' [Citation.] In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound

16

by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment." ' " (*Gomez*, *supra*, 54 Cal.App.5th at p. 1026.)

Where the issue on appeal arises "from a determination of failure of proof at trial, the question for the reviewing court is 'whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769 (*Almanor*).) That is, where " 'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465 (*Sonic*).) Instead, " 'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether . . . the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Id*. at p. 466.)

### B. Claims Related to Pay-on-Death Accounts

The bulk of Annabelle's claims at trial centered on Norina's alleged undue influence over the 2015 trust amendments. However, on appeal Annabelle neither presses these claims nor challenges the trial court's finding that she failed to establish that the 2015 trust amendments were procured through Norina's undue influence.

In this court, Annabelle focuses on the trial court's findings (or lack thereof) on the POD bank accounts. She asserts that the trial court ignored or failed to rule upon her claims related to the establishment of the POD accounts and Norina's withdrawals from them. Annabelle argues that she presented "uncontroverted evidence" of Norina's undue influence over Asuncion in the opening and funding of the POD accounts during the period that Asuncion was cognitively impaired. Annabelle additionally asserts that before Asuncion's death, Norina withdrew and used for her personal benefit $95,501 of

17

POD account funds. Annabelle cites this evidence in support of what she characterizes as her "claim of undue influence by Norina in her handling of the POD bank accounts" (boldface omitted) as well as her elder financial abuse claim.

As set forth in Annabelle's December 2019 first amended petition, these claims fall under her allegation against Norina of elder financial abuse.[9] Annabelle alleged in the petition that when Norina established the POD accounts in April 2015, Asuncion "was 85 years old with significant cognitive impairment" and Norina "obtained these POD accounts by her exercise of fraud and undue influence." Annabelle alleged that Norina "knew or should have known that depriving Asuncion" of her cash assets was likely to be harmful to Asuncion, the survivor's trust, and the bypass trust, thus constituting a taking of Asuncion's property "for a wrongful use" under the Elder Abuse and Dependent Adult Civil Protection Act (Elder Abuse Act or Act).

We examine these claims in turn. We first consider Annabelle's contention that the trial court erred as a matter of law by misconstruing the statutory definition of elder financial abuse to require proof that Norina's financial transactions were made against Asuncion's will or without her consent. We then review Annabelle's contention that Norina committed elder financial abuse in two ways—first, by exercising undue influence over the creation and funding of the POD accounts and second, by taking Asuncion's property (primarily funds in the POD accounts) for a wrongful use during Asuncion's lifetime.

1. Legal Principles Governing Elder Financial Abuse Claims

The Elder Abuse Act (Welf. & Inst. Code, § 15600 et seq.) authorizes " 'financial abuse' " claims under Welfare and Institutions Code section 15657.5 based on proof by a

---

[9] Although Annabelle's briefing on appeal presents "undue influence" as a separate issue on appeal, "undue influence" is not a standalone claim under the relevant provisions of the Welfare and Institutions Code. (See, e.g., Welf. & Inst. Code, §§ 15610.30, subd. (a)(3) [making "undue influence" one means of elder financial abuse], 15610.70, subd. (a) [defining " '[u]ndue influence' "].)

18

preponderance of the evidence.  (*Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 859 (*Mahan*).)  The proponent of the claim (here, Anabelle) bears the burden of proof.  (CACI No. 3100; see *Paslay v. State Farm General Ins. Co.* (2016) 248 Cal.App.4th 639, 657 (*Paslay*).)

The Elder Abuse Act describes three types of financial abuse:  (1) taking (secreting, appropriating, etc.) real or personal property of an elder "for a wrongful use or with intent to defraud, or both"; (2) assisting in the taking of the same "for a wrongful use or with intent to defraud"; and (3) taking real or personal property of an elder "by undue influence," as defined in Welfare and Institutions Code section 15610.70.  (Welf. & Inst. Code, § 15610.30, subd. (a)(1)–(3); *Levin v. Winston-Levin* (2019) 39 Cal.App.5th 1025, 1034 (*Levin*).)  Only the first and third types of financial abuse are asserted here.

The Act defines taking an elder's property "for a wrongful use" as occurring when the person who takes the property "knew or should have known that this conduct is likely to be harmful to the elder or dependent adult."  (Welf. & Inst. Code, § 15610.30, subd. (b).)  It defines the "taking" element as "when an elder . . . is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative."  (*Id*., subd. (c).)  A " 'representative' " includes an attorney-in-fact of the elder who acts within the authority of the power of attorney.  (*Id*., subd. (d).)

These provisions "define the requisite level of culpability broadly."  (*Mahan*, *supra*, 14 Cal.App.5th at p. 856.)  Interpreted together, a defendant "will be liable for 'depriv[ation]' ([Welf. & Inst. Code,] § 15610.30, subd. (c)) of an elder's property that is taken 'for a wrongful use or with intent to defraud' (*id.*, subd. (a)(1), (2)), *or* that is committed by 'undue influence' (*id.*, subds. (c), (a)(3))."  (*Id.* at pp. 856–857, italics omitted.)

The Act defines taking an elder's property "by undue influence" based on the statutory definition of undue influence set forth in Welfare and Institutions section

19

15610.70. (Welf. & Inst. Code, § 15610.30, subd. (a)(3).) The law defines undue influence in this context as "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (*Id.*, § 15610.70, subd. (a); see also Prob. Code § 86.) Undue influence may be understood as "pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96 (*Rice*); *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1354.) Factors relevant to whether a result was procured by undue influence include the vulnerability of the victim, the influencer's apparent authority (including status as a fiduciary, family member, or care provider), the actions or tactics used by the influencer, and the equity of the result. (Welf. & Inst. Code, § 15610.70, subd. (a)(1)–(4).)

The burden to prove allegations of undue influence is significant, with some courts requiring proof by clear and convincing evidence. (*Gomez*, *supra*, 54 Cal.App.5th at p. 1040; see *Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 545 (*Doolittle*); *In re Ventura's Estate* (1963) 217 Cal.App.2d 50, 58, italics omitted [" 'It is frequently said that a strong showing is necessary [to prove undue influence], or that the proof must be by clear and convincing evidence.' "].)

While the party challenging the testamentary disposition bears the burden of proof, a presumption of undue influence can arise "upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice*, *supra*, 28 Cal.4th at p. 97.) Application of the presumption shifts the burden of proof to the proponent of the testamentary instrument, who must prove by a preponderance of evidence that the instrument was not the result of undue influence.

20

(*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 605 (*Sarabia*), superseded by statute on other grounds as stated in *Rice*, at p. 97.)

By contrast, elder financial abuse allegations of "wrongful use" or "with an intent to defraud" do not employ a burden shifting framework. Under the statute, a person will be deemed to have taken the elder's property "for a wrongful use if, among other things, the person . . . [1] takes, secretes, appropriates, obtains, or retains the property and [2] the person . . . knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." (Welf. & Inst. Code, § 15610.30, subd. (b).) A party need not establish that the taker had an intent to defraud if it can be shown that the person took the property for a wrongful use as defined by the statute. (*Bonfigli v. Strachan* (2011) 192 Cal.App.4th 1302, 1315.)

### 2. Against the Elder's Will

Annabelle contends that the trial court erred as a matter of law by misconstruing the statutory definition of elder financial abuse to require that Annabelle prove that Norina's actions concerning the POD accounts were against Asuncion's will or without her consent. Whether the trial court misconstrued the statute is a question of law which we review de novo. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) However, to the extent that we are called to review the trial court's application of the law to the facts, we defer to the trial court's findings of fact if supported by substantial evidence. (*Connerly*, *supra*, 37 Cal.4th at p. 1175.)

The trial court cited the relevant statute on elder financial abuse in its statement of decision and in a brief paragraph set forth its reasons for rejecting the claim. It found that Annabelle did not meet her burden in proving fraud or undue influence regarding the 2015 estate documents (a finding Annabelle does not challenge on appeal). With respect to the joint POD account transactions, the trial court stated, "there is no evidence that these transactions were entered into against or contrary to Asuncion's will." The court

21

thus concluded that Annabelle "cannot show that [Norina] committed financial elder abuse."

Annabelle interprets this language in the statement of decision as imposing a nonexistent statutory requirement that a plaintiff alleging elder financial abuse must prove that the taking of property was " 'entered into against or contrary to [the elder's] will.' " She argues that to require proof that the taking of property was against the elder's will would make it nearly impossible to prove elder financial abuse due to the cognitive challenges often present in these cases, contravening the Legislature's intent in enacting the Elder Abuse Act.

Norina counters that the language cited in the trial court's statement of decision merely constitutes a finding of fact and an elucidation of the court's reasoning, not an improperly added element of the cause of action. Norina asserts that substantial evidence supports the court's determination that Annabelle failed to meet her burden to prove elder financial abuse, whether by undue influence or another means.

We reject Annabelle's contention that the language used by the trial court in its statement of decision to address the POD accounts represents an improper construction of the statutory claim. "Absent evidence to the contrary, we presume that the trial court knew the law and followed it." (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.) The trial court correctly cited the three types of elder financial abuse under the statute. (Welf. & Inst. Code, § 15610.30, subd. (a)(1)–(3).) Its reference to "Asuncion's will" does not occur together with its statement of the law, nor does the court's reasoning suggest that it viewed the will of the elder as a necessary element to proving liability.

Instead, following its summary reference to the prior findings of insufficient evidence to establish fraud or undue influence in relation to the 2015 estate documents, the court observed in relation to the POD account transactions that there was "no *evidence* that these transactions were entered into against or contrary to Asuncion's will." (Italics added.) The court thus considered Norina's conduct with respect to the POD

22

accounts to be a factual question. Under the first and third prongs of the statute, liability is premised on a taking of the elder's property "for a wrongful use or with intent to defraud" (Welf. & Inst. Code, § 15610.30, subd. (a)(1), (2)) or by "undue influence" (*id.*, subd. (a)(3)).

In assessing whether the trial court erred, we consider any relevant findings of fact in light of the statutory elements, taking into account that in amendments to the Elder Abuse Act in 2008, the Legislature broadened the definition of " 'financial abuse' " and made procedural changes designed to facilitate the bringing of financial abuse claims. (*Mahan*, *supra*, 14 Cal.App.5th at p. 860; see Stats. 2008, ch. 475, § 1.) Among the changes, the Legislature replaced the prior " 'wrongful use' " requirement that " 'bad faith' be shown with a standard based on [] whether the defendant 'knew or should have known' of 'likely' harm to the elder." (*Mahan*, at p. 860, citing Welf. & Inst. Code, § 15610.30, subd. (b).) It also "redefined the phrase 'takes, secretes, appropriates, obtains, or retains' so that any 'depriv[ation]' of property was subject to liability, including 'by means of agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly' by the elder or on his behalf by a third-party ([Welf. & Inst. Code,] § 15610.30, subd. (c))." (*Mahan*, at p. 860.) As a result, courts interpret the meaning of "taking" broadly, consistent with the definition of "deprive" and with the statute's inclusion of "an agreement" or "donative transfer" as a means for effectuating a taking under the statute.

Annabelle emphasizes this point in arguing that any findings related to Asuncion's will are clearly erroneous, given the purposes of the law and that the statutory definition of financial abuse includes even a donative transfer. She contends that the evidence proves the requisite taking or deprivation based on Norina's actions in opening the POD accounts, depositing into the POD accounts the Genworth long-term care reimbursement payments (thus giving herself access to and a future interest in those funds), and

23

ultimately transferring $95,501 from the POD Accounts for her personal use while Asuncion was still alive.

We agree with Annabelle that even an agreed-upon or donative transfer by the elder can constitute a "taking" or deprivation under the statute. (*Mahan*, *supra*, 14 Cal.App.5th at p. 861 [noting that elderly couple's intent to gift the money to the trust "makes no difference" in that "liability may flow from deprivations carried out by 'a person or entity . . . by means of an agreement, donative transfer, or testamentary bequest' "].) But we reject Annabelle's contention that Asuncion's intent is legally irrelevant to whether Asuncion's property was taken for a wrongful use or by undue influence under Welfare & Institutions Code section 15610.30.

Since " '[d]irect evidence as to undue influence is rarely obtainable' " (*Lintz*, *supra*, 222 Cal.App.4th at p. 1355), courts typically rely on circumstantial evidence and " 'inferences drawn from all the facts and circumstances.' " (*Ibid*.; accord *Keading v. Keading* (2021) 60 Cal.App.5th 1115, 1125.) Expressions of a decedent's testamentary intentions are relevant in examining "undue profit" for purposes of deciding whether property was taken by undue influence. (*Sarabia*, *supra*, 221 Cal.App.3d at p. 605, superseded by statute on other grounds as stated in *Rice*, *supra*, 28 Cal.4th at p. 97; see also *Newman v. Casey* (2024) 99 Cal.App.5th 359, 377 (*Newman*) [noting mother's testimony as to undue influence showing that it "was not her intent" that her daughter receive the property in question during the mother's lifetime].) Further, in evaluating undue influence for purposes of elder financial abuse, the statute directs courts to consider the equity of the result, including "any divergence from the victim's prior intent or course of conduct or dealing." (Welf. & Inst. Code, § 15610.70, subd. (a)(4).) We therefore conclude that the trial court did not erroneously add an element to Annabelle's claim of elder financial abuse; nor did it err in considering Asuncion's intent with respect to the establishment and use of the POD accounts.

24

We turn to Annabelle's contentions that the trial court erred in its conclusion that she failed to show that the alleged taking occurred "by undue influence" (Welf. & Inst. Code, § 15610.30, subd. (a)(3)), or "for a wrongful use or with intent to defraud, or both" (*id.*, subd. (a)(1)).

### 3. Undue Influence

Annabelle contends that the trial court failed to address her evidence of undue influence both as to the "creation" and "management" of the POD accounts. She asserts that she presented "uncontroverted evidence" of both categories of conduct, in that (1) Norina took the cognitively impaired Asuncion in April 2015 to Bank of America and opened two POD accounts that were payable, upon Asuncion's death, to Norina's own personal living trust, and (2) Norina took a total of $95,501 from the POD accounts prior to Asuncion's death and "did so by exercising undue influence over Asuncion."

Despite Annabelle's framing of the issue on appeal, we do not agree that Annabelle's "undue influence" claim applies to Norina's withdrawals from the POD accounts. Elder financial abuse by undue influence occurs when a person "[t]akes, secretes, appropriates, obtains, or retains" the property of an elder by "excessive persuasion *that causes another person to act or refrain from acting* by overcoming that person's free will and results in inequity." (Welf. & Inst. Code, §§ 15610.30, subd. (a)(3)), 15610.70, subd. (a), italics added.) Undue influence in this context is "a concept with a very definite meaning." (*Sarabia*, *supra*, 221 Cal.App.3d at p. 604, superseded by statute on other grounds as stated in *Rice*, *supra*, 28 Cal.4th at p. 97.) Undue influence is thus defined in terms of cause and effect, where the influencer's "excessive persuasion" (Welf. & Inst. Code, § 15610.70, subd. (a)) causes the influenced party "*to act* or *refrain from acting* by overcoming that person's free will and results in inequity" (*ibid*). (Italics added.)

Case law reinforces the centrality of the influenced party's action, or restraint from action, as resulting from the influencer's coercive pressure. "Evidence must be produced

that pressure was brought to bear directly upon the testamentary act. [Citation.] Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will, and must amount to coercion destroying free agency on the part of the testator." (*In re Welch's Estate* (1954) 43 Cal.2d 173, 175; accord *Sarabia*, *supra*, 221 Cal.App.3d at p. 604; see *Rice*, *supra*, 28 Cal.4th at p. 96 [explaining undue influence as "pressure brought to bear *directly on the testamentary act*, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency"], italics added.)

On this factual record, only Norina's conduct in jointly *creating* or *establishing* the POD accounts could be construed as effecting "excessive persuasion that *causes* another person [i.e., Asuncion] to act or refrain from acting by overcoming that person's free will . . . ." (Welf. & Inst. Code, § 15610.70, subd. (a), italics added.) Any subsequent conduct by Norina—including her alleged withdrawal of $95,501 from the POD accounts during Asuncion's remaining lifetime—cannot reasonably be construed as "pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will" (*Rice*, *supra*, 28 Cal.4th at p. 96), since there is no evidence that Asuncion acted, or refrained from acting, with respect to the individual withdrawals. We therefore limit our consideration of Annabelle's contentions concerning the third type of elder financial abuse—based on taking of the elder's property "by undue influence" as set forth in Welfare and Institutions Code section 15610.30, subdivision (a)(3))—to the creation of the POD accounts.[10]

The statute directs a court to consider four factors when evaluating a testamentary disposition for undue influence: (1) the vulnerability of the victim (Welf. & Inst. Code,

---

[10] We separately consider Annabelle's arguments based on Norina's withdrawals from the POD accounts as arising under Welfare and Institutions Code section 15610.30, subdivision (a)(1), concerning taking for a "wrongful use." (See pt. II.B.4., *post*.)

26

§ 15610.70, subd. (a)(1)); (2) the influencer's apparent authority, which may be evidenced by a fiduciary or family relationship (*id*., subd. (a)(2)); (3) the actions or tactics used by the influencer, which may include controlling the victim's life, use of affection or coercion, or initiating changes in an estate plan, particularly where haste or secrecy is used (*id*., subd. (a)(3)); and (4) the equity of the result, which accounts for economic consequences to the victim, divergence from prior estate plans, and "the appropriateness of the change in light of the length and nature of the relationship" (*id*., subd. (a)(4)). To establish a presumption of undue influence with respect to the POD accounts, Annabelle must show that she established Norina (1) had a confidential relationship with Asuncion, (2) actively participated in procuring the creation of the POD accounts, and (3) would "benefit unduly by" the accounts. (*Rice*, *supra*, 28 Cal.4th at p. 97; *Sarabia*, *supra*, 221 Cal.App.3d at p. 605, superseded by statute on other grounds as stated in *Rice*, at p. 97.)

Annabelle contends that Norina's admissions and testimony that she was actively involved in establishing the POD accounts satisfy the second and third elements for undue influence as a theory of elder financial abuse, shifting the burden of persuasion to Norina. In addition, Annabelle maintains that the trial court did not address the POD evidence at all in considering whether Norina exercised undue influence over Asuncion.

Norina counters that the trial court did in fact address the POD accounts in its decision, finding that Annabelle had "failed to show that assets belonging to the trust were misappropriated" or that "the Genworth long term care insurance payments [used to fund the POD accounts] were assets of the [t]rust." Furthermore, the court found "there is no evidence" that the transactions involving the POD accounts "were entered into against or contrary to Asuncion's will." Norina argues that these findings "cannot be understood in any other way except as a ruling on whether the POD [b]ank accounts were obtained by undue influence."

We agree that the trial court made findings on the POD accounts, set forth in the statement of decision paragraphs addressing Annabelle's other claims. The court explicitly found there was insufficient evidence to conclude that (1) the Genworth long term care insurance payments (deposited into the POD accounts) were assets of the trust, (2) the transactions related to the POD accounts involved assets belonging to the trust, and (3) the POD accounts and transactions were entered against or contrary to Asuncion's will. Given the complexity of the trial record and overlapping arguments made by Annabelle's counsel at trial about the evidence supporting Annabelle's allegations of undue influence, fraud, elder financial abuse, and misappropriation of trust assets, it is unsurprising that the statement of decision organizes its discussion of the evidence and related findings differently than does Annabelle on appeal. For purposes of conducting substantial evidence review, "[a] trial court's statement of decision need not address all the legal and factual issues raised by the parties; it is sufficient that it set forth its ultimate findings, such as on an element of a claim or defense." (*Almanor*, *supra*, 246 Cal.App.4th at p. 770.)

We turn to whether substantial evidence in the record supports the trial court's determination that Annabelle failed to shift her burden of proof regarding Norina's undue influence over Asuncion with respect to the establishment of the POD accounts. Because Annabelle raised the POD accounts in her objections to the court's proposed statement of decision regarding undue influence, we do not rely upon implied findings in favor of Norina on this issue.[11] (See *Arceneaux*, *supra*, 51 Cal.3d at p. 1133.) Rather, we look to the court's express findings on undue influence generally and on the POD accounts specifically.

[11] Because we conclude that the trial court did reach the contested issue, and Annabelle properly asserted objections related to the tentative ruling in the proposed statement of decision, we need not consider Norina's alternative assertion that Annabelle's remedy for the court's alleged failure to address part of her claim was to file a motion for reconsideration rather than raise the issue on appeal.

In so doing, we " ' " 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].' " ' " (*Gomez, supra*, 54 Cal.App.5th at p. 1026.) That contrary evidence exists in the record is not determinative, since our review " 'begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881, italics omitted.) Furthermore, insofar as Annabelle appeals from a determination that she failed to shift the burden of proof as to undue influence, the question presented at this juncture is whether the evidence *compels a finding* in her favor as a matter of law. (*Almanor, supra*, 246 Cal.App.4th at p. 769.)

On the record presented, we conclude that Annabelle is unable to satisfy this burden with respect to the establishment of the POD accounts. We reject Annabelle's characterization of the relevant evidence as "uncontroverted," although we agree that certain facts were uncontested. It was undisputed that Norina drove Asuncion to the bank and signed the initial withdrawal of funds that were used to open the POD accounts in April 2015. These funds came from Asuncion's Commonwealth Credit Union account, including $17,789.95 in Genworth long-term care insurance reimbursement funds initially deposited into the Commonwealth account, and $5,612 in Asuncion's own funds. Norina continued to deposit the long-term care insurance reimbursement payments into the POD accounts on Asuncion's behalf. In June 2017, Norina transferred an additional $7,000 from the survivor's trust account to one of the POD accounts.[12]

However, other evidence concerning the POD accounts was highly contested. Such evidence includes Norina's testimony about her role and Asuncion's intent in

---

[12] At oral argument, Norina's counsel stated that Norina does not contest that $7,000 was transferred from the survivor's trust to the POD accounts but asserted that those funds, like the personal funds from Asuncion's Commonwealth account, were Asuncion's funds to use.

opening the POD accounts and in making Norina's personal trust the pay-on-death beneficiary. Norina testified that in doing so, she was not acting on her own but was carrying out her mother's intent to open the POD accounts. According to Norina, Asuncion's intent for the POD accounts was to have an account separate from the trust to deposit and track the Genworth long-term care insurance reimbursement payments. Asuncion wanted the POD accounts for her use "outside of the rigid accounting requirements for the trust," including for travel and expenses related to her separate Philippines property. Norina testified that the POD accounts were to be Asuncion's "own mad money fund" "under Asuncion's control, not the trust or trustee's."[13] It is apparent from the statement of decision that the trial court credited Norina's testimony concerning Asuncion's wish to establish the POD accounts using her own funds and intent to keep the insurance reimbursements separate from the trust accounts.

On substantial evidence review, we " ' "may not reweigh the evidence and are bound by the trial court's credibility determinations." ' " (*Gomez*, *supra*, 54 Cal.App.5th at p. 1026.) Viewing the evidence in the light most favorable to the judgment, we conclude that substantial evidence in the record supports the trial court's determination that Norina did not exercise undue influence over Asuncion's decision to establish the POD accounts using Asuncion's personal funds. Annabelle has proffered no evidence that the creation of the POD accounts and giving Norina's personal trust an exclusive survivorship interest in all those funds was the result of "excessive persuasion" and the "overcoming" of Asuncion's free will by Norina. (Welf. & Inst. Code, §§ 15610.30, subd. (a)(3), 15610.70, subd. (a).)

---

[13] At trial, the parties contested whether the Genworth long-term care insurance payments were in fact assets belonging to the trust that were improperly shifted to the non-trust POD accounts. At oral argument, Annabelle's counsel clarified that Annabelle does not challenge on appeal the trial court's finding that Annabelle had not established that the long-term care policy reimbursements deposited into the POD accounts were trust assets.

Annabelle appears to contend that the facts surrounding the creation of the POD accounts nevertheless establish the elements of presumptive undue influence, shifting the burden to Norina to show that she did not procure joint ownership of the POD accounts by undue influence.  Since Annabelle, as the party alleging undue influence in the POD account transactions, bore the initial burden to establish the three burden shifting elements, this argument " 'turns on a failure of proof at trial.' " (*Sonic*, *supra*, 196 Cal.App.4th at p. 466.)  Even assuming satisfaction of the first two burden shifting elements based on (1) the confidential relationship between Norina and Asuncion, and (2) Norina's uncontroverted involvement in setting up the POD accounts, Annabelle has not shown that the evidence pertaining to the third element was (1) " ' "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Ibid*.)

To the contrary, the trial court expressly found there was insufficient evidence to conclude the POD accounts were established against or contrary to Asuncion's will.  This finding is relevant to the burden shifting element of undue benefit to the alleged influencer (*Rice*, *supra*, 28 Cal.4th at p. 97), because whether a beneficiary's profit is " 'undue' " necessarily requires the factfinder to consider the totality of the evidence concerning "the respective relative standings of the beneficiary and the contestant to the decedent" in ascertaining "which party would be the more obvious object of the decedent's testamentary disposition." (*Sarabia*, *supra*, 221 Cal.App.3d at p. 607.)

As the trial court observed in its statement of decision, early evidence of Asuncion's intent (namely, the handwritten will from 2004) suggests that Asuncion had considered wholly eliminating Sandy and Annabelle as beneficiaries of her will.  By 2015, Asuncion had retained counsel to execute a restatement of the trust and eventually to help her file a petition to address the Printempo property and further amend the trust, increasing the beneficial interests of Carolina and Norina and decreasing the interests of Annabelle and Sandy.  The court found that during this period, although Asuncion

31

suffered some degree of diminished mental capacity, the evidence was "not convincing that her mental condition was such to permit a subversion of her will." It was during this same period, shortly before the filing of the court petition in 2015, that Asuncion and Norina opened the POD accounts, naming Norina as co-owner of the accounts, and naming her personal trust as the pay-on-death beneficiary. Asuncion's clinical diagnosis of Alzheimer's dementia followed more than a year later, in December 2016. Asuncion's bookkeeper and accountant, Chi Nguyen, testified that it was her normal practice to recommend pay-on-death accounts for her elderly clients with children. Norina also testified that it was Asuncion's desire to separate the Genworth reimbursement payments from the survivor's trust assets.

This evidence, viewed as a whole and drawing all reasonable inferences in favor of the judgment (*Gomez*, *supra*, 54 Cal.App.5th at p. 1026), supports the trial court's determination that the creation of the POD accounts was not in conflict with or contrary to Asuncion's will. Insofar as the establishment of the accounts was not contrary to Asuncion's will, it was not the product of undue influence that overcame that will.

We therefore decide that substantial evidence in the record supports the trial court's findings related to the creation of the POD accounts, and Annabelle has not met her burden of showing that the burden of proof as to Annabelle's theory of undue influence over the establishment of the POD accounts shifted to Norina. This conclusion precludes a finding of elder financial abuse based on the establishment of the POD accounts "by undue influence." (Welf. & Inst. Code, § 15610.30, subd. (a)(3).) As this conclusion is sufficient to affirm the trial court's denial of this aspect of Annabelle's petition, we decline to consider Annabelle's additional arguments suggesting that Norina failed to rebut the presumption of undue influence with "clear and convincing evidence" that Asuncion had agreed to gift the POD account funds to her.

We next consider Annabelle's elder financial abuse claim based on Norina's withdrawal of funds from the POD accounts.

32

### 4. Taking For a Wrongful Use

Annabelle contends the trial court erred in rejecting her elder financial abuse claim for Norina's taking of $95,501 from the POD accounts for Norina's personal use during a time that Asuncion was experiencing significant cognitive decline and had been diagnosed with Alzheimer's dementia. Annabelle maintains that Norina's conduct constituted "wrongful use" because the funds Norina withdrew from the POD accounts belonged solely to Asuncion.

Norina does not dispute that she engaged in the transactions identified by Annabelle. Norina, however, does contest Annabelle's assertion of Norina's intent with respect to the transactions and maintains that substantial evidence in the record supports the trial court's ruling that Norina did not engage in elder financial abuse.

Financial abuse based on the taking of an elder's property "for a wrongful use" under Welfare and Institutions Code section 15610.30, subdivision (a)(1) occurs when the person who takes the property "knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." (*Id*., subd. (b).) The "taking" element is satisfied when the elder "is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative." (*Id*., subd. (c).) A " 'representative' " includes both a trustee of the elder's estate and an attorney-in-fact of the elder who acts within the authority of the power of attorney. (*Id*., subd. (d)(1), (2).) These provisions, particularly considering the 2008 amendments to the Act, "define the requisite level of culpability broadly." (*Mahan*, *supra*, 14 Cal.App.5th at p. 856.)

Annabelle contends that the statutory elements are satisfied here because Norina used Asuncion's property—including $183,238 in Genworth reimbursement payments and $7,000 in survivor's trust money—to fund the POD accounts, in which Norina had obtained a 100 percent future interest upon Asuncion's death. Annabelle argues that while the accounts were created and managed by Norina in her representative capacity,

33

Norina's use of the accounts to withdraw $95,501 prior to Asuncion's death operated to deprive Asuncion of a property right "by means of an agreement." (Welf. & Inst. Code, § 15610.30, subd. (c).)

Annabelle further asserts, as she did in her objections to the trial court's proposed statement of decision, that under section 5301, a joint or multiple-party account "belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each, unless there is clear and convincing evidence of a different intent." (§ 5301, subd. (a).) She maintains that insofar as the evidence shows the POD accounts were funded entirely with Asuncion's funds, and Norina did not provide "clear and convincing evidence" of an intent other than the statutory default of proportional beneficial ownership, Norina possessed no personal interest in the POD accounts until Asuncion's death and thus had "no right" to withdraw funds before that time. Annabelle emphasizes that Norina's power of attorney also did not provide specific authority for her to transfer joint POD account funds to her personal accounts.

As explained in our discussion of Norina's alleged undue influence over the establishment of the POD accounts, Annabelle has not shown that the funding of the accounts was the result of undue influence or contravened Asuncion's wishes. Because those funds were deposited into the POD accounts, which Asuncion opened and owned (jointly with Norina) during her lifetime, Annabelle has not shown that the funding of the POD accounts with Asuncion's personal and/or survivor's trust funds deprived Asuncion of a property right as required to establish the taking element of elder financial abuse based on wrongful use.[14] (Welf. & Inst. Code, § 15610.30, subd. (c).)

---

[14] At oral argument, Annabelle clarified that she does not appeal the trial court's finding that the long-term care insurance reimbursements from Genworth were not trust assets. (See *ante*, fn. 13.) Furthermore, under the terms of the 2015 restatement, Asuncion had unlimited power to take money out of the survivor's trust during her lifetime, and the trustee had authority to do so at Asuncion's direction and for her benefit. Regarding the $7,000 transferred in June 2017 from the survivor's trust account to a POD

Norina's withdrawal and/or transfer of up to $95,501.12 from the POD accounts for what appear to be personal uses presents a closer question. We agree with Annabelle that neither Norina's role as Asuncion's attorney-in-fact during the relevant time period, nor as trustee of Asuncion's trusts, shields Norina from potential liability under this section of the elder financial abuse statute. (Welf. & Inst. Code, § 15610.30, subd. (d)(1), (2).) We further agree that insofar as Norina has not disputed the transactions identified by Annabelle at trial or in her briefing on appeal, it appears to be "uncontroverted" that the transactions occurred.

The relevant transactions consist of two transfers of $25,000 each in May 2017 from POD accounts to two individual investment accounts in Norina's name, a transfer of $2,950.49 in June 2017 to Norina's personal property investment in Grove Resort, Florida, and according to the spreadsheet compiled by Annabelle's accounting expert at trial to show withdrawals from the POD accounts, $35,100.63 in transfers to Norina's personal checking account and $7,450 in unexplained cash withdrawals.[15]

We presume, for purposes of the argument on appeal, that Norina's transfer of funds from the joint POD accounts to personal accounts in her own name while Asuncion was alive and diagnosed with Alzheimer's dementia meets the statutory definition of "takes, secretes, appropriates, obtains, or retains," property in that Asuncion was thereafter "deprived of [her] property right" to directly access those funds. (Welf. & Inst. Code, § 15610.30, subd. (c).) The cases cited by Annabelle support this understanding of the law. (See, e.g., *Mahan*, *supra*, 14 Cal.App.5th at p. 861 [construing the statutory term " 'deprive' " consistent with its ordinary meaning of " 'the taking away of anything

account, Norina testified that the transfer might have been in error—a fact we address in our discussion of Annabelle's removal claim, *post*.

[15] Neither party at trial adduced testimony from Norina regarding the latter amounts ($35,100.63 in transfers from the POD accounts to Norina's checking account between December 2016 and January 2018, and $7,450 in cash withdrawals during that time) identified by Annabelle's expert.

enjoyed; dispossession' " to apply to the defendants' act of restructuring life insurance policies held in trust]; *Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 472, 479 [holding that the alleged execution of escrow instructions that significantly impaired the value of real property owned by a trust was sufficient to plead a "taking" based on deprivation of a property right "by means of an agreement" within the meaning of Welf. & Inst., § 15610.30, subd. (c)].)

However, Annabelle has not articulated the evidence at trial, if any, establishing the "wrongful use" element of the financial abuse allegation. Because the facts surrounding Norina's use of and knowledge concerning the funds she transferred and/or withdrew are disputed, we review the underlying factual findings for substantial evidence (*Ghirardo*, *supra*, 8 Cal.4th at p. 800), resolving any conflicts in the evidence and drawing any reasonable inferences in support of the trial court's decision. (*Gomez*, *supra*, 54 Cal.App.5th at p. 1026.) Moreover, as the party with the burden of proof at trial, Annabelle must show on appeal that the evidence that Norina took the money "for a wrongful use" was essentially " ' "uncontradicted and unimpeached" (*Sonic*, *supra*, 196 Cal.App.4th at p. 466), compelling a finding in Annabelle's favor as a matter of law. (See *Almanor*, *supra*, 246 Cal.App.4th at p. 769.)

Annabelle asserts that Norina should have known that transferring funds she testified belonged to Asuncion to accounts in her own name was "likely to be harmful to the elder" (Welf. & Inst. Code, § 15610.30, subd. (b)). Annabelle contends the withdrawals went against Asuncion's testamentary intent, which as set forth in her last will (executed at the time of the 2015 amendments), distributed any remainder of her property to the survivor's trust, which in turn divided the property (in varying proportions) among her surviving children.

Annabelle's argument fails to address contrary evidence in the record. The trial court implicitly credited Norina's testimony that she established the POD accounts with Asuncion, consistent with Asuncion's intent during a time when Asuncion had not

36

experienced a precipitous cognitive decline.  Annabelle also does not set forth any of the material testimony at trial regarding Asuncion's desired uses for the funds in the POD accounts and Norina's recollection of the two $25,000 transfers in May 2017 and the $2,950.49 in June 2017.  By citing selectively to the evidence favorable to her position, Annabelle fails to support her contention that the trial court erroneously rejected her financial abuse allegation.  (See *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 [emphasizing it is the appellant's task, in challenging the evidence to support a finding, "to set forth . . . a summary of the material evidence upon that issue"]; *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 [" 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable,* and *show how and why it is insufficient.*' "].)

At trial, Norina testified that Asuncion wanted the POD accounts for personal uses like travel and to cover expenses on the Philippines property.  Norina also testified there were times that she (Norina) used the POD account funds "to backfill and pay certain expenses" related to her mother's trusts, such as taxes, or for expenses related to their Philippines travel.  Norina reaffirmed her prior deposition testimony at trial stating that the money in the POD accounts was her mother's and that Norina's transactions on the account were " 'not for [herself] or for [her] own purposes or benefit.' "

When asked on cross-examination by Annabelle's counsel about the two $25,000 transfers, Norina agreed the investments were "made to an account in [her] name at the time" but asserted that was because her mother "wasn't capable enough to go to a bank to transact" those investments herself.[16]  Norina also testified that the two $25,000

---

[16] Specifically, Annabelle's counsel asked, "Ms. Sharpe, are these investments for you?"  Norina responded, "They were made in my name because my mother was not in a -- was not healthy enough to be able to do this transaction herself."  When pressed again by Annabelle's counsel whether "these two transactions [were] made for [her] personally?"  Norina protested that counsel was "not asking the right thing or even [her] reason for doing these two transactions."  The court allowed the question to be read back,

investments were still in Norina's name at the time of trial, implying that Norina had not spent the funds. Anabelle did not present evidence undermining this assertion.

Regarding the $2,950.49 transaction to her Florida property, Norina testified that her mother had entrusted her to manage the POD accounts, which involved "a lot of back and forth between" Philippines travel and the use of Norina's credit cards for related expenses. Norina believed she had used funds only for her mother's benefit and asserted she had confused account numbers when she made the transaction in 2017, believing the "2891" account (one of the POD account endings) from which Norina transferred the funds to the Florida property was Norina's personal account.

Annabelle did not present any evidence to the contrary. Annabelle presented no evidence regarding Asuncion's intent with respect to the POD accounts or the funds therein. Instead, Anabelle relied solely on the testimony of her expert witness to show that the withdrawals were made by Norina. Other than Norina's own testimony, there is no evidence in the trial record about the purpose of the disputed withdrawals or Asuncion's knowledge of them.

The above recited evidence, viewed in the light most favorable to the trial court's ruling, does not establish wrongful use under Welfare and Institutions Code section 15610.30, subdivision (a)(1), which requires some evidence that Norina "knew or should have known that [her] conduct [wa]s likely to be harmful to [Asuncion]." (Welf. & Inst. Code, § 15610.30, subd. (b).) This definition of "wrongful use," while no longer requiring a showing of "bad faith," nevertheless "imposes an additional requirement beyond the existence of improper conduct, namely, that 'the person or entity *knew or should have known* that this conduct is likely to be harmful to the elder . . . adult."

and Norina responded, "These two transactions were made to an account in my name at the time." The cross-examination continued, "Are these two investments still in your name, ma'am?" to which Norina stated, "Yes, they are." Annabelle's counsel did not ask any further questions about these transactions.

(*Paslay*, *supra*, 248 Cal.App.4th at p. 657.)  Courts have interpreted the phrase "knew or should have known" in this (and other) statutory contexts as requiring "actual or constructive knowledge."  (*Ibid*.)  Constructive knowledge is typically "assessed by reference to an objective 'reasonable person' measure" (*id*. at pp. 657–658), which here gains further support from the legislative history of the 2008 changes to the elder financial abuse law.  (*Id*. at p. 658, fn. 15; accord, *Mahan*, *supra*, 14 Cal.App.5th at p. 860, fn. 18.)

As applied to the evidence in this case, the "wrongful use" standard thus imposes a requirement not only that Norina transferred funds from the joint account she held with Asuncion to her personal account, but that she did so with at least constructive knowledge of likely harm to Asuncion.  (Welf. & Inst. Code, § 15610.30, subd. (a)(1), (b); *Paslay*, *supra*, 248 Cal.App.4th at pp. 657–658.)  By relying only on evidence verifying the fact of the transfers, Annabelle has failed to make this showing.

As the First District Court of Appeal recently observed in a case involving allegations of intra-family elder abuse, "in our view, this was an exceedingly close case even under the preponderance of the evidence standard.  However, the question before us is not whether we would have reached a different conclusion had we been the triers of fact.  Rather, our review is confined to whether any substantial evidence supports the trial court's findings, and in this regard it has often been said '[i]t is not our role to interfere with the trial court's assessment of the witnesses' demeanor and credibility.' "  (*Newman*, *supra*, 99 Cal.App.5th 359 at p. 378.)

We decide that substantial evidence in the record, which the trial court credited, supports a determination that Norina understood her actions to be consistent with her mother's intent and in support of her mother's wishes.  Such conduct, from an objective, reasonable person's standpoint, would not be harmful, because Norina understood her actions to be on behalf of Asuncion and for her benefit.  For this same reason, given that the trial court's findings implicitly credited Norina's understanding of the transactions,

Norina's mistaken transfer of $7,000 of survivor's trust funds to the POD accounts does not automatically equate to a taking for a wrongful use that constitutes elder financial abuse.

We furthermore disagree with Annabelle regarding the application of section 5301 as a basis to deem Norina's transfers and withdrawals a wrongful use. Annabelle asserts that under section 5301, Norina "had no right" to take any of the funds based on the statutory default of proportional beneficial ownership, whereby "[a]n account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each, unless there is clear and convincing evidence of a different intent." (§ 5301, subd. (a).) This provision, read in isolation, appears to restrict joint account owners to their proportionate contributions. However, we construe the words of a statute "in context, . . . considering the particular clause or section in the context of the statutory framework as a whole." (*Stevens v. Tri Counties Bank* (2009) 177 Cal.App.4th 236, 243 (*Stevens*); see *Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1385.)

Section 5301 is part of the California Multiple–Party Accounts Law (CAMPAL) (§ 5100 et seq.). CAMPAL's purpose, based on Article 6 of the Uniform Probate Code, entitled "Nonprobate Transfers on Death," is to facilitate the transfer of property on death without probate, especially for those with small estates. (*Stevens*, *supra*, 177 Cal.App.4th at pp. 234–244.) The provision Annabelle relies upon, when read in its statutory context, does not restrict the power of joint owners to transact according to the terms of the account. Rather, as explained in *Lee v. Yang* (2003) 111 Cal.App.4th 481, 487 (*Lee*), " 'the provisions [of section 5301 et seq.] concerning beneficial ownership as between parties . . . are relevant only to controversies between these persons and their creditors and other successors, and *have no bearing on the power of withdrawal of these persons as determined by the terms of account contracts*.' (§ 5201, italics added.)" Put differently, "[t]he section 5301 rule of proportional ownership is not relevant to the power of a party to withdraw funds from an account; rather, that issue is determined by

40

the terms of the account in question. (§ 5201, subd. (a).)" (*Lee*, at p. 489; accord *Stevens*, *supra*, 177 Cal.App.4th at p. 245.) Thus, under CAMPAL, the terms of the POD accounts, which authorized the Bank to "pay the money in the account to, or on the order of, any person named on the account," governed Norina's right to the joint POD account funds during the time period in question.

We conclude that Annabelle has not meet her burden on appeal to show that the evidence of Norina's withdrawals from the POD accounts compelled a finding of elder financial abuse as a matter of law. (*Almanor*, *supra*, 246 Cal.App.4th at p. 769.) Norina's position as a joint account holder, as with her power of attorney and trustee roles, is relevant to but ultimately does not dictate whether her conduct violated the Elder Abuse Act. Furthermore, the evidence of Norina's purpose or reasons for transferring and/or withdrawing the POD account funds was contested. While we agree with Annabelle that the elder's will is not an element of consideration insofar as proving an elder financial abuse violation, it can be relevant to the court's assessment of "wrongful use" and whether the party taking or retaining the elder's property "knew or should have known that [her] conduct is likely to be harmful to the elder." (Welf. & Inst. Code, § 15610.30, subds. (a)(1), (b).) In finding "no evidence that these transactions were entered into against or contrary to Asuncion's will," the court necessarily rejected the premise that Norina sought to deprive Asuncion of access to or benefit from the funds.

In summary, viewed in the light most favorable to the prevailing party, substantial evidence in the record establishes that Norina opened the POD accounts jointly with her mother in fulfillment of her mother's intent, and that Norina acted "at the request of [her] mother" and invested the funds in accordance with her understanding that the POD account funds belonged to her mother and were there for her benefit during her lifetime. Since "wrongful use" occurs when "among other things, the person . . . knew or should have known that this conduct is likely to be harmful to the elder or dependent adult" (Welf. & Inst. Code, § 15610.30, subd. (b)), it follows that Norina's withdrawals on a

41

joint account would not qualify under circumstances where the trial court has credited her testimony that her actions were consistent with her mother's desired use of the funds. We decide that the trial court did not err in rejecting Annabelle's claim of elder financial abuse based on insufficient evidence.

### C. Removal of Trustee

Annabelle challenges the trial court's denial of her removal claim on two grounds. She contends that the court ignored the evidence of undue influence, fraud, and elder financial abuse in relation to the POD accounts. In addition, she asserts that the court failed to consider her other alleged bases for removal, including Norina's purported breaches of fiduciary duty as trustee and violations of numerous Probate Code provisions.

#### 1. Legal Principles

The Probate Code authorizes the removal of a trustee "in accordance with the trust instrument, by the court on its own motion, or on petition of a settlor, cotrustee, or beneficiary under [s]ection 17200." (§ 15642, subd. (a).) Section 15642, subdivision (b) sets forth grounds for removal of a trustee by the court. These grounds include: "Where the trustee has committed a breach of the trust," "[w]here hostility or lack of cooperation among cotrustees impairs the administration of the trust," and "[w]here the trustee fails or declines to act." (§ 15642, subd. (b)(1), (3), (4).) The breach of the duty of loyalty, or any of several other statutory duties, is considered a breach of trust. (§ 16400.) "The purpose of removing a trustee is not to inflict a penalty for past action, but to preserve the trust assets. [Citation.] 'The question in each case is whether the circumstances are such that the continuance of the trustee in office would be detrimental to the trust.' " (*Getty v. Getty* (1988) 205 Cal.App.3d 134, 139–140.)

Courts express the removal power as requiring a careful exercise of the trial court's discretion. The authority to remove a trustee "is a power that the court should not lightly exercise, and whether or not such action should be taken . . . rests largely in the discretion of the trial court. Furthermore, the court will not ordinarily remove a trustee

42

appointed by the creator of the trust." (*Estate of Bixby* (1961) 55 Cal.2d 819, 826 (*Bixby*).) Thus, where the trustee has been appointed by the trust settlor, it is unlikely that the court will order her removal "unless a disqualification clearly appears" in the record. (*Ibid*.; *Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 958 (*Trolan*); see *Jones v. Stubbs* (1955) 136 Cal.App.2d 490, 501 (*Jones*) [explaining that on appeal following a trial court's refusal to grant removal, the question "is not whether the court would have been justified in refusing to make these appointments, but is whether a disqualification so clearly appears that it must be said that the court abused its discretion"].)

We review a trial court's decision on the removal of a trustee for abuse of discretion. (*Trolan*, *supra*, 31 Cal.App.5th at p. 957; see *Bixby*, *supra*, 55 Cal.2d at p. 826; *In re Gilmaker's Estate* (1962) 57 Cal.2d 627, 633.) " 'To determine if a court abused its discretion, we must [] consider "the legal principles and policies that should have guided the court's actions." ' " (*Trolan*, at p. 958, quoting *Sargon Enterprises, Inc. v. University of Southern Calif.* (2012) 55 Cal.4th 747, 773.) To the extent that the decision to remove a trustee is premised on interpretation of the trust instrument, we independently interpret the trust as a question of law. (*Doolittle*, *supra*, 241 Cal.App.4th at pp. 539–540.)

> 2. Analysis

Whether the trial court erred in denying the removal petition in this case depends on the terms of the relevant trust instrument and the court's findings pertaining to the statutory grounds for removal. According to the trust instruments (the 2015 restatement and first amendment), the trustee may be removed "at any time for cause." The restatement defines " 'for cause' " to mean and include "any material act or omission to act by a trustee or other fiduciary constituting ordinary negligence, gross negligence, self-dealing or intentional fraud."

Annabelle alleged these bases for removal, including self-dealing and fraud based on Norina's establishment and management of the POD accounts. However, the trial

court found that Annabelle had failed to show "sufficient good cause" to remove Norina as trustee. (Capitalization & boldface omitted.) The court explained that given its findings that Annabelle had not demonstrated undue influence or fraud by Norina, "any hostility between Norina and Annabelle does not rise to the level of impairing the administration of the trust." It denied the removal petition on those grounds.

We are not persuaded that the trial court's decision exceeded the bounds of its discretion. (Cf. *Trolan*, *supra*, 31 Cal.App.5th at p. 958.) Although Annabelle asserts Norina's alleged acts of undue influence and elder financial abuse warrant her removal as trustee, we have already reviewed the trial court's findings against Annabelle on those claims and determined that the evidence does not compel an alternate conclusion. We therefore decide that the court did not err in denying the petition for Norina's removal as trustee on these grounds.

Annabelle frames the other asserted bases for removal in terms of Norina's alleged breaches of her fiduciary duties as trustee. In her removal petition, Annabelle stated this claim in terms of Norina "embezzling [t]rust funds through her two secret [POD] accounts" as well as transferring trust funds into her own personal and investment accounts, engaging in self-dealing, failing to provide documentation when requested to Annabelle as a beneficiary of the trust, and failing to administer the trust consistent with her duties under section 16000.[17] She reiterates these points on appeal, as she did in her objections to the proposed statement of decision. She argues that Norina violated her duty of loyalty (§ 16002) by refusing to distribute the bypass trust assets in accordance with the provisions of that trust, by improperly transferring bypass trust funds to the survivor's trust for her own personal benefit, and by engaging in knowing and willful violations of her duties related to, among other things, provide change of trustee

---

[17] Section 16000, et seq., describe trustees' duties to administer the trust, except to the extent provided for otherwise in the trust instrument.

44

notifications (§ 16061.7), provide accountings (§ 16062), and prevent commingling and keep trust property separate (§ 16009).

Norina responds that Annabelle essentially asks this court to reweigh the evidence in the case and ignore the substantial evidence in the record supporting the trial court's decision to deny the removal claim. Norina points to Asuncion's attorney Kimberly Barrot's testimony regarding Asuncion's execution of the 2015 estate documents and to Norina's own testimony about her actions as trustee.

The duties of a trustee administering a trust include, among others, the duty of loyalty, the duty to avoid conflicts of interest, the duty to preserve trust property, the duty to make trust property productive, and the duty to report and account. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 462; *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 888 (*Uzyel*); see §§ 16002–16006, 16060.) The duty of loyalty set forth in section 16002, subdivision (a), requires the trustee " 'to act in the highest good faith' " (*Trolan*, *supra*, 31 Cal.App.5th at p. 959) toward the beneficiaries of the trust and refrain from obtaining " 'any advantage [] over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind.' " (*Ibid*.) A trustee's violation of "any duty that the trustee owes the beneficiary" constitutes a breach of trust. (§ 16400.)

In its statement of decision, the trial court did not expressly address Annabelle's arguments based on Norina's alleged breach of the duty of loyalty and violations of her other statutory duties. Nevertheless, the court found that any hostility between Norina and Annabelle had not risen to the level of impairment of the administration of the trust. The court also found, in addressing Annabelle's misappropriation claim, that Annabelle failed to show that assets belonging to the trust were misappropriated. These findings necessarily entail the trial court's rejection, on the basis of insufficient evidence, of Annabelle's claim that Norina breached her duties of trust administration and engaged in self-dealing (i.e., misappropriation). For the reasons explained *ante*, Annabelle has not

demonstrated under the substantial evidence standard that the trial court erred, or that the evidence she presented on the removal claim " 'compels a finding' " in her favor as a matter of law. (*Almanor*, *supra*, 246 Cal.App.4th at p. 769.)

*Jones*, *supra*, 136 Cal.App.2d 490, illustrates the high bar Annabelle faces in seeking to overturn the trial court's judgment on her removal petition. *Jones* involved a dispute between the three surviving daughters and the widow of the trust settlor, John L. Stubbs. (*Ibid*.) Stubbs's daughters were beneficiaries and remaindermen under the trust, while his widow was a beneficiary and the trustee. (*Ibid*.) After a trial, the trial court rejected the daughters' contentions that the widow-trustee's removal was proper due to various breaches of trust, including her transfer of significant funds from the trust estate to herself, her failure to comply with tax regulations causing loss to the trust estate, and her failure to fulfill the purpose of the trust when she voluntarily dissolved the corporation without the consent of all beneficiaries. (*Id*. at pp. 496–497.)

On appeal, the daughters contended that Stubbs's widow violated her trust duties in five major instances and should have been removed. (*Jones*, *supra*, 136 Cal.App.2d at p. 491.) They argued, citing established principles, that " '[t]rustees are subject to removal whenever, as here, it appears that their private interests conflict with their trust duties, and when it also appears, as here, that trust property has been appropriated to their own use, whether or not they purported to act honestly under an assumption that they would become entitled to it and the money was returned when the contrary proved to be the fact.' " (*Id*. at p. 500.) The Court of Appeal acknowledged the evidence of improper conduct by Stubbs's widow but ultimately rejected the claim of error on appeal. It emphasized the appellate posture, stating that "in the instant case the appeal is from an order refusing to remove the trustee. If the court had ordered the removal of respondent trustee[,] we are satisfied that there is sufficient evidence in the record to support such an order. But the court did not find in accordance with appellants' allegations, and the question with which we are confronted upon the appeal is: Can it be held upon the record

46

before us that the court abused its discretion in refusing to remove the respondent trustee?" (*Ibid.*) The court reasoned based upon the record that the trial court was justified in finding that Stubbs's widow "had not acted in a manner detrimental to the trust or to the beneficiaries" such as to require her removal as trustee. (*Id.* at p. 502.)

The same principles apply to Annabelle's claims here. By way of example, Annabelle contends that the terms of the bypass trust concerning the distribution of assets upon the death of the surviving spouse limit the trustee's power to defer the distribution of trust assets to not more than six months after the surviving settlor's death. She asserts that after more than five years, Norina has still failed to make any of the required bypass trust distributions, in violation of the trust terms and demonstrating both a failure to act and unfitness to remain the trustee. However, even if we accept as undisputed the fact that Norina has not made distributions under the bypass trust, Annabelle never asserted this failure as a ground for removal of the trustee in the removal petition. Nor has Annabelle provided any legal authority to support her contention regarding the meaning of the bypass trust provision concerning "trustee's power to defer division or distribution" (capitalization & boldface omitted) or the effect of the trust contest and removal petition on the administration of the trusts. Annabelle asserts that because she did not contest the bypass trust, "there is no reason for Norina not having fulfilled her primary trust duty of distributing the [b]ypass [t]rust assets in accordance with the timeline set forth in the . . . instrument at [a]rticle 5.2." That conclusory argument does not constitute " ' "uncontradicted and unimpeached" ' " (*Sonic*, *supra*, 196 Cal.App.4th at p. 466) evidence of a breach of trust so as " 'to leave no room for a judicial determination that it was insufficient to support a finding' " (*ibid.*) of breach of trust mandating removal.

As another example, Annabelle contends that the evidence proves that Norina took funds from the bypass trust, under which she inherits 33 percent, deposited those funds into the survivor's trust, under which she inherits 80 percent, and furthermore used

bypass trust funds to pay for Asuncion's care despite the continuing availability of the POD account funds. Annabelle maintains that these acts depleted the bypass trust shares for the beneficiaries while maximizing Norina's personal interest in the POD accounts. She argues there was no need for Norina to transfer bypass funds to the survivor's trust for Asuncion's care or benefit, because Asuncion had no debt, received Social Security income and a retirement pension, and had ample cash reserves due to the Genworth long-term care reimbursements deposited into the POD accounts. Annabelle asserts that Norina's transfers from the bypass to the survivor's trust for this purpose violated the terms of the bypass trust, which according to Annabelle, "restricted payments of [b]ypass [t]rust funds to the surviving settlor by requiring that consideration shall be given '. . . to all other income and resources that are known to the trustee. . .' to be available to the surviving settlor before [b]ypass [t]rust funds could be expended for the surviving settlor's support." She contends the trial court erred by failing to address Norina's use of bypass trust funds (rather than the POD account funds) in breach of her duty of loyalty to the trust and its beneficiaries.

We are not persuaded, based on the record and relevant trust language, by Annabelle's showing that Norina's use of bypass trust funds for Asuncion's care and maintenance violated the terms of the trust. The relevant trust language governing the disposition of bypass trust funds until the death of the surviving settlor grants significant discretion to the trustee. It provides that the trustee "shall pay to or apply for the benefit of the surviving settlor [Asuncion], . . . so much of the net income and principal of the trust as the trustee deems proper to pay the reasonable expenses for the health, education, support, and maintenance of [the surviving settlor and beneficiaries]. . . . No amount paid or applied need thereafter be repaid to the trustee or restored to the trust. In exercising discretion, the *trustee shall give the consideration that the trustee deems proper to all other income and resources that are known to the trustee and that are readily available to the beneficiaries for use for these purposes*. All decisions of the trustee regarding

48

payments under this subsection, if any, are within the trustee's discretion and shall be final and incontestable by anyone." (Italics added.)

This language does not, in fact, restrict the trustee's discretion to apply bypass trust funds for the benefit of the surviving settlor but requires the trustee to "give the consideration that the trustee deems proper" to other income and resources known to the trustee that are available for that purpose. Annabelle has introduced no evidence demonstrating that Norina's use of bypass trust funds for Asuncion's benefit during her lifetime was without consideration of the availability of the POD account funds or improper. Furthermore, Annabelle's references to the amount of bypass funds Norina used and/or commingled with survivor's trust funds appear to conflate bypass trust funds used or expended during Carolina's tenure as trustee of the bypass trust and are not clearly supported by the cited record.[18] The evidence Annabelle relies upon fails to meet her burden on appeal of establishing that "a disqualification clearly appears" in the record that would not only support, but compel, a decision by the trial court to remove Asuncion's appointed trustee. (*Bixby*, *supra*, 55 Cal.2d at p. 826; *Almanor*, *supra*, 246 Cal.App.4th at p. 769; *Jones*, *supra*, 136 Cal.App.2d at p. 498.)

Other evidence cited by Annabelle that she contends establishes Norina's use of survivor's trust funds for non-trust purposes arguably raises difficult questions about

---

[18] Annabelle asserts, without citing the record, that transfers of bypass trust funds to the survivor's trust "totaling $89,043 are documented back to January 2014, and include $70,063 in funds removed during Norina's tenure as co-trustee and trustee of the [s]urvivor's [t]rust." This does not account for Carolina's role as trustee of the bypass trust for part of this time. Further, Annabelle asserts that "Norina extensively co-mingled $70,063 of [b]ypass [t]rust funds . . . with [s]urvivor's trust funds," but the record citation (to the [b]ypass [t]rust bank account summary) shows only $18,740 in transfers from the bypass trust to the survivor's trust account between October 2016 (when Norina became trustee of both the survivor's trust and bypass trust) and September 2018, about nine months after Asuncion's death. We are unable to ascertain, from Annabelle's briefing on appeal and the record, the source of the asserted $70,063 in bypass trust funds that Norina allegedly comingled.

49

Norina's management of trust assets. Norina admitted transferring $7,000 (inadvertently, according to her trial testimony) in June 2017 from the survivor's trust to a POD account. In addition, Norina's first accounting for the survivor's trust for the period of October 24, 2016 to April 30, 2019, shows that she transferred a total of $27,717 in survivor's trust funds in April 2018 and 2019 to pay for taxes and sales expenses associated with the Philippines property. Even so, these transfers—even if presumed to be improper—do not compel a conclusion that Norina failed to abide by the standard of loyalty required of her as trustee. Annabelle introduced no direct evidence suggesting that Norina failed to act in good faith in making these transfers or sought to obtain advantages over the other trust beneficiaries. (*Trolan*, *supra*, 31 Cal.App.5th at p. 959; see § 16002, subd. (a).) While the trial court might have inferred from the evidence presented that Norina breached her duty of loyalty by failing to administer the trust solely in the interest of the beneficiaries, it in fact drew the opposite conclusion.

As in *Jones*, we conclude that nothing in the record compels us to override the trial court's factfinding and conclude the trial court abused its discretion. (*Jones*, *supra*, 136 Cal.App.2d at p. 502.) The trial court heard extensive evidence, over a 16-day trial, concerning Norina's asserted misconduct as trustee, including her alleged mismanagement and misappropriation of survivor's trust funds, failure to comply with her fiduciary duties of trust administration and fidelity to the interests of the beneficiaries, and self-enrichment through the establishment and use of the POD accounts to her exclusive benefit. After weighing the testimony of the witnesses and arguments of the parties, including their extensive objections to the court's proposed statement of decision, the court rejected all contentions based on the alleged misappropriation of trust assets and found no good cause to remove Norina as trustee.

Nothing in our review of the record suggests that the court disregarded the evidence presented, relied on erroneous legal principles, or carried out an arbitrary and capricious application of the law to the facts. (*Haraguchi v. Superior Court* (2008) 43

Cal.4th 706, 712.) Although the court did not specifically address all the evidence presented at trial or make express findings regarding Annabelle's breach of duty allegations, its findings as to the ultimate facts and material issues in the case support its decision not to remove Norina as trustee. (*Thompson*, *supra*, 6 Cal.App.5th at p. 983.)

Having concluded that the judgment is supported as to Annabelle's underlying claims of undue influence and elder financial abuse, and in the absence of evidence sufficient to compel contrary factual findings by the trial court regarding Annabelle's removal claim, we decide that the court's omission of specific findings on the bases for removal is harmless error. (*Nunes*, *supra*, 200 Cal.App.3d at p. 1525.) Furthermore, we understand the trial court's comments about the deferred accounting hearing to suggest that, while the evidence at trial was insufficient to prove breach of trust and warrant the removal of a trustor-appointed trustee, the accounting would afford Annabelle an opportunity to scrutinize any funds transferred improperly between the trusts or, as in the case of the $7,000 of survivor's trust funds, into the POD accounts.

### D. Self-dealing With a Trust Asset

Annabelle contends that Norina's conduct in relation to a family heirloom that the parties refer to as "the mirror" represents self-dealing with a trust asset in violation of section 164004, subdivision (c), raising a statutory presumption of breach of the trustee's fiduciary duty. She argues that the fraud perpetuated by Norina proves both a breach of her fiduciary duty and serves as further evidence that the trial court erred in failing to remove Norina as trustee. Specifically, Annabelle contends there was undisputed evidence at trial that in June 2018, while serving as trustee, Norina entered into an agreement with Annabelle in which she agreed to distribute an heirloom mirror to Annabelle in exchange for Annabelle signing a quitclaim to her ownership interest in Asuncion's non-trust real property in the Philippines. Annabelle testified that after signing the quitclaim, she never received the mirror.

51

Norina responds that Annabelle improperly asks this court to rule on the claim she advances under section 16004, even though that provision does not create an independent right of action and, in any event, was not asserted in either the original petition or first amended petition as a cause of action. Norina argues that even assuming, arguendo, that Annabelle properly pleaded a private right of action based on a violation of section 16004, the trial court made no ruling on it, and Annabelle's proper recourse would have been to file a motion for reconsideration, not an appeal of a nonexistent ruling. Annabelle maintains in her reply brief that her claim under section 16004 "is but one part of the breach of trust claim" that she pleaded against Norina in her trust contest and removal petition. She asserts that a motion for reconsideration was not required to assert this error on appeal, since she properly raised the issue in the trial court and presented the claim of error in her objections to the proposed statement of decision.

In its statement of decision, the trial court construed Annabelle's arguments and evidence related to the mirror and purported agreement as an unpled breach of contract claim. It explained that Annabelle "now argues a breach of contract claim with regards to a mirror," and that "[g]iven that this claim was unpled, and thus would be prejudicial to [Norina]," the court would deny the breach of contract claim "without prejudice." Annabelle challenged this aspect of the court's ruling in her objections to the proposed statement of decision, stating that her breach of trust claim applies to the mirror.

We disagree with Annabelle that she "pled breach of trust" in her petition and first amended petition. Neither of those petitions appears to contain any specific allegations of breach of trust, fiduciary duty, or violation of section 16004. Nevertheless, we accept, for purposes of argument on appeal, that Annabelle's claim pertaining to the mirror and Norina's alleged violation of section 16004 could arguably be considered part of the self-dealing claim that Annabelle asserted in her removal petition. In that claim, Annabelle alleged that sections 16420 and 17200 authorized Norina's removal as trustee as a remedy for her alleged breach of fiduciary duties in the administration of the trust,

52

including "the duty not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust" and the "prohibition on self-dealing transactions." This is consistent with Annabelle's framing of the issue in her objections to the proposed statement of decision.[19]

Having decided that Annabelle presented the issue of the mirror at trial as evidence in support of her allegations of self-dealing and breach of trust by Norina in relation to her administration of trust assets, we nevertheless are not persuaded that any reversible error occurred here. Even assuming the trial court mischaracterized the dispute over the mirror as an "unpled breach of contract claim," Annabelle has not shown that the mischaracterization and denial without prejudice of the unpled "claim" was prejudicial.

Our Supreme Court has explained that the "state Constitution provides that '[n]o judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) 'The effect of this provision is to eliminate any presumption of injury from error, and to require that the appellate court examine the evidence to determine whether the error did in fact prejudice the defendant. Thus, reversible error is a relative concept, and whether a slight or gross error is ground for reversal depends on the circumstances in each case.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*).) An error may be declared a " 'miscarriage of justice' " " 'only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Ibid.*)

---

[19] By contrast, at trial, Annabelle's counsel argued that the relevance of the evidence pertaining to the mirror and agreement regarding the Philippine property transactions was conduct that "has to do with the administration of the trust and falls under the Probate Code [section] 850 claim."

Annabelle asserts that the facts are "undisputed" that her agreement to sign the documents in June 2018 related to the Philippine property was in exchange for Norina's promise to deliver the mirror, and that Norina's failure to deliver on the promise triggers the presumption of a conflict of interest and violation of the trustee's fiduciary duties under section 16004, subdivision (c).[20] However, the trial court resolved Annabelle's trust contest and removal petition claims against her based on insufficient evidence, as reviewed in our discussion *ante*.

On review from a statement of decision following a bench trial, we resolve any conflict in the evidence and draw all reasonable inferences in support of that determination. (*Gomez*, *supra*, 54 Cal.App.5th at p. 1026.) The documentary evidence related to the mirror and admitted at trial includes communications (e-mails and a memo) exchanged by Annabelle and Norina in June 2018 to attempt to resolve issues related to Norina's administration of the trusts and to preparing the Philippine properties for sale. The communications do not conclusively settle the matter of the mirror, and even appear to disagree about whether there are one or two mirrors.[21] They certainly are not " ' "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding" ' " (*Almanor*, *supra*, 246 Cal.App.4th at p. 769) that the correspondence constituted a transaction in which Norina obtained an advantage from

---

[20] Section 16004, subdivision (c), states that "[a] transaction between the trustee and a beneficiary which occurs during the existence of the trust . . . and by which the trustee obtains an advantage from the beneficiary is presumed to be a violation of the trustee's fiduciary duties."

[21] Annabelle's communications to Norina discuss two mirrors, though Norina responds that she is only aware of one mirror. The correspondence reveals that Annabelle and Norina each had a different understanding of their mother's wishes concerning the disposition of the mirror. Also, Norina's written memo to Anabelle, which Annabelle relies upon, states that Norina is "preparing a [s]tatement" to be signed by Annabelle and Larry, by which Norina agrees to deliver the mirror if Annabelle agrees that after her death, the mirror will be returned to Norina, or to her daughter Sarah. It is unclear from the record whether such an agreement was reached.

Annabelle so as to trigger the presumption.  While the court did not make findings on the alleged breach of trust committed by Norina in negotiating the purported agreement between her and Annabelle to obtain Annabelle's signature on the Philippine property quitclaim, it expressly rejected as unsupported by sufficient evidence the broader breach of trust allegations advanced in support of Annabelle's removal claim.

Given that the trial court credited Norina's testimony and characterization of her actions in attempting to administer the trust, and drawing all reasonable inferences in support of the court's rejection of Annabelle's self-dealing and removal claim, we conclude it is not " 'reasonably probable that a result more favorable to the appealing party would have been reached' " (*Cassim*, *supra*, 33 Cal.4th at p. 800) had the trial court separately and expressly addressed the evidence and arguments related to the mirror as part of the self-dealing or breach of trust claims.  We therefore reject Annabelle's claim of reversible error based on section 16004.

Having decided that Annabelle has not shown reversible error in the trial court's resolution of the claims in her petition, we turn to the issues raised by Norina in her cross-appeal.

*E.  Defense of Laches*

Norina contends that the trial court erred by not finding Annabelle's trust contest and elder abuse claims barred by the defense of laches, based on service of the 2015 petition on Annabelle.

1.  Legal Principles

Laches is an equitable defense that can apply in trust actions to address a plaintiff's delay in asserting a right.  It is " ' "based on the principle that those who neglect their rights may be barred from obtaining relief in equity." ' " (*Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 263 (*Golden Gate*).)  To establish laches, the defendant must show there was " 'unreasonable delay plus either acquiescence in the act about which [the] plaintiff complains or prejudice to

55

the defendant resulting from the delay.' " (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 68 (*Johnson*); *Estate of Kampen* (2011) 201 Cal.App.4th 971, 998.)

Delay may be measured from the time the plaintiff knew (or should have known) about the alleged claim. (*Drake v. Pinkham* (2013) 217 Cal.App.4th 400, 406 (*Drake*).) However, the determinative factor is " 'not so much a question of the lapse of time as . . . whether prejudice has resulted.' " (*Conti v. Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 360.) In the absence of prejudice or acquiescence, delay alone does not establish the defense. (*Id*. at p. 362; *Lam v. Bureau of Security & Investigative Services* (1995) 34 Cal.App.4th 29, 36).)

2. Analysis

The trial court found that the evidence did not establish that Annabelle received notice of the hearing on the 2015 petition. Norina asks this court to review the trial court's laches decision de novo, arguing there are no relevant facts in dispute since prior court orders resolved the question of proper notice to Annabelle of the 2015 petition regarding the Printempo property transaction and proposed amendments to the survivor's trust. She maintains the trial court failed to consider the legal effect of the prior court orders and the "overwhelming evidence" that Annabelle knew the basis of her claims for years, or even decades, but took no action until after Asuncion's death.

In response, Annabelle argues that substantial evidence supports the trial court's rejection of the equitable defense based on testimony that she never received notice of the 2015 petition. She contends that Norina waived her other argument based on acquiescence by failing to assert it in the trial court.

"Generally, a trial court's laches ruling will be sustained on appeal if there is substantial evidence to support the ruling." (*Johnson*, *supra*, 24 Cal.4th at p. 67.) However, laches may be decided as a matter of law where the relevant facts are undisputed. (*Golden Gate*, *supra*, 165 Cal.App.4th at p. 263.)

56

The trial court found that Norina established proof of service of notice on the 2015 petition, but at the same time, credited Annabelle's and Larry's testimony that they never received notice of the hearing in 2015. The court also found that Norina failed to show acquiescence by Annabelle or prejudice to Norina due to the delay. To the extent that our review turns on the trial court's findings on the disputed issues of notice in 2015, or of long-term acquiescence based on Annabelle's awareness of her sisters' involvement in her mother's affairs, we review the court's decision for substantial evidence. We moreover agree with Annabelle that, notwithstanding the prior court orders confirming proper notice of the 2015 petition and hearing, substantial evidence supports the trial court's determination.

Norina contends that the prior court orders "conclusively establish that Annabelle did have notice of the 2015 [p]etition *in 2015*" but waited more than three years to file her petitions. She asserts that the delay, during which time two key witnesses (Carolina and Asuncion) died, prejudiced her ability to respond to Annabelle's claims against the trust. Norina cites *Drake* in support of the proposition that a beneficiary's delay in bringing a petition to invalidate trust amendments until after the death of the trust settlors is "necessarily prejudicial" where the petition centers on the trustor's mental capacity and vulnerability to undue influence. (*Drake*, *supra*, 217 Cal.App.4th at p. 409.)

We agree with Norina that *Drake* is instructive in evaluating prejudice to the defendant from any delay in the plaintiff's filing of suit. However, *Drake* is distinguishable on the facts, because in that case it was undisputed that the plaintiff had reviewed copies of the contested trust amendments in a prior action that later ended in settlement and "knew or should have known of the facts giving rise to the causes of action." (*Drake*, *supra*, 217 Cal.App.4th at p. 407.) Here, it is undisputed that while the probate court in 2015 found that notice of the hearing on the 2015 petition "ha[d] been given as required by law," Annabelle and Larry testified that they received no notice and had no knowledge of the 2015 amendments until after Asuncion's death.

57

In rejecting the defense of laches, the trial court implicitly credited that testimony and the evidence rebutting any presumption that the mailed notice was received. (See, e.g., Evid. Code, §§ 604, 641; § 1215, subd. (a)(4).) Other evidence in the record arguably corroborates Annabelle's assertion that she never received notice, including Annabelle's and Larry's requests in 2018 for copies of the 2015 estate documents, and the billing records for the estate planning firm that prepared Asuncion's 2015 petition. These records showed a billing entry for preparation and mailing of the notice to Sandy but no equivalent entry showing mailing of the notice to Annabelle.

We conclude that this evidence was sufficient to support the trial court's finding that Annabelle did not receive the notice of the changes to the survivor's trust in 2015. Nor are we persuaded that other evidence at trial demonstrates that Annabelle "knew about the basis for her allegations" almost 20 years before trial. As the party bearing the standard of proof at trial for the defense, Norina has not shown that the evidence pertaining to Annabelle's concern about Asuncion relinquishing control to Carolina after Rafael's death was so uncontradicted or compelling as to require a finding by the court that Annabelle knew or should have known, at that time, of the facts giving rise to her petition claims. (*Almanor*, *supra*, 246 Cal.App.4th at p. 769.)

The trial court heard this evidence and deemed it insufficient to support a laches defense, given the credible testimony that Annabelle was not aware of the 2015 petition and amendments and therefore neither knew (nor should have known) about the alleged undue influence or other challenges to the validity of the later restatement and first amendment. (Cf. *Drake*, *supra*, 217 Cal.App.4th at p. 407.) The determination that Norina did not meet her burden to prove unreasonable delay or acquiescence is well supported by the record.

### F. No Contest Petition

Norina challenges the trial court's denial of her no contest petition as to Annabelle and Sandy. She contends the court erroneously assessed probable cause based on

"[s]uspicions and [c]onjecture[]" (underscoring omitted) regarding the 2015 estate planning documents, rather than on the facts known to Annabelle at the time of filing. She further argues that the filing of the trust contest without probable cause violated the no contest clauses of the trust, restatement, and first amendment, requiring the disinheritance of Annabelle and Sandy.

### 1. Additional Background

To understand Norina's contention that the trial court erred in failing to enforce the no contest clauses against Annabelle and, by extension, Sandy, we briefly set forth the facts relevant to Sandy's position as a respondent to Norina's amended petition.

In 2018 and 2019, Annabelle filed the relevant trust contest and accounting petitions and her removal petition. In response, Norina filed her petition to enforce the no contest clause and for surcharge. Sandy was not a party to those petitions.

In 2019, Annabelle filed a declaration by Sandy in support of a motion for order permitting financial discovery into Norina's financial condition. Sandy's declaration stated that he had not received a copy of the 2015 petition or related order and he was unaware of the restatement and first amendment until after May 2018. He asked that the trial court set aside the 2015 petition and the resulting court order "because [he] was not informed of it when it was filed, and, as a result, [he] had no opportunity to object."

In a subsequent motion for leave to amend her no contest and surcharge petition, Norina argued that Sandy's declaration constituted a filed pleading that sought to void the court's 2015 order authorizing the first amendment. She contended this action violated the no contest clause. The probate court granted Norina's request to amend her petition to enforce the no contest clause.[22] In June 2021, Norina served Sandy by first-class mail with a copy of the amended no contest petition.

---

[22] Although the parties have not cited, and we have not found in our independent review of the record, a copy of the order granting Norina leave to amend her petition to

Later in the litigation, Norina successfully moved to compel responses to discovery requests that she had served on Sandy and to deem admitted her unanswered requests for admission. The probate court deemed admitted, as to Sandy only, facts contained in the requests for admission that Norina had served on him and to which he had not responded. The requests for admission that the court deemed admitted included admissions pertaining to Norina's no contest petition, i.e., "[t]hat by executing Sandy's [d]eclaration, Sandy intended to directly contest the 2015 [r]estatement (RFA No. 11)" and "[t]hat at the time he executed Sandy's [d]eclaration, Sandy lacked probable cause to contest the 2015 [r]estatement." Norina maintained that these admissions were relevant to her petition to enforce the no contest clause as to Sandy.

At trial, Annabelle filed a motion in limine asking the court to dismiss Sandy as a party on the ground that it lacked jurisdiction over him. Annabelle argued that Norina's first-class mail service of the notice of hearing and amended petition failed to comply with California's long arm statute for service on an out-of-state resident. The trial court denied the motion in limine. At trial, the court ruled that the notice to Sandy was proper and that he had failed to respond to the amended petition to enforce the no contest clause and for surcharge. The court stated that it was prepared to sign the request for default as to Sandy and emphasized that the default "has nothing to do" with the court's ruling on the no contest petition as to Annabelle and was "solely in regard to [Sandy] and the fact that he did not respond after being properly served."

---

enforce the no contest clause, pleadings filed later in the case refer to the probate court's order. According to these pleadings, the probate court noted, in pertinent part, " 'Although personal jurisdiction appears to be an issue in this case, the [c]ourt finds that [Norina] should have an opportunity to show jurisdiction over Sandy Liberato and properly serve him. The issue of personal jurisdiction is an issue that should be raised by Sandy Liberato if and when [Norina] is able to serve him. Clearly, if Sandy Liberato is not properly served before trial, he would be dismissed from this action.' "

### 2. Legal Principles

A "no contest clause in a trust instrument 'essentially acts as a disinheritance device, i.e., if a beneficiary contests or seeks to impair or invalidate the trust instrument or its provisions, the beneficiary will be disinherited and thus may not take the gift or devise provided under the instrument.' [Citation.] No contest clauses, whether in wills or trusts, have long been held valid in California. [Citations.] Such clauses promote the public policies of honoring the intent of the donor and discouraging litigation by persons whose expectations are frustrated by the donative scheme of the instrument." (*Donkin*, *supra*, 58 Cal.4th at p. 422.)

California's statutory scheme codified and developed the common law rules regarding the enforcement of no contest clauses. (*Donkin*, *supra*, 58 Cal.4th at pp. 422–426.) Under the current statutory scheme, applicable here, a no contest clause is enforceable in response to a direct contest to a trust that is brought without probable cause. (§ 21311, subd. (a)(1); *Doolittle*, *supra*, 241 Cal.App.4th at p. 539; *Donkin*, at p. 426.)

Probable cause exists, within the meaning of the statute, "if, at the time of filing a contest, the facts known to the contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery." (§ 21311, subd. (b).) A " '[d]irect contest' " is a contest seeking to invalidate the trust instrument or terms on grounds including lack of capacity, fraud, or undue influence. (§ 21310, subd. (b).) A " '[n]o contest clause' " is defined as "a provision in an otherwise valid instrument that, if enforced, would penalize a beneficiary for filing a pleading in any court." (*Id.*, subd. (c).)

The parties do not dispute the applicability of these provisions to Annabelle's trust contest. The disputed issue instead turns on whether the trial court erred in basing its probable cause determination on evidence presented at trial.

61

In assessing this claim, we independently interpret the relevant trust provisions as a question of law. (*Doolittle*, *supra*, 241 Cal.App.4th at pp. 539–540.) We review de novo the trial court's application of the no contest provision but review any underlying factual findings under the substantial evidence standard.[23] (See *Meiri v. Shamtoubi* (2022) 81 Cal.App.5th 606, 614; *Cundall v. Mitchell-Clyde* (2020) 51 Cal.App.5th 571, 579, fn. 7 (*Cundall*).)

### 3. Analysis

The no contest clause contained in the 2015 restatement specifically provides for the disinheritance of any beneficiary under the trust who "without probable cause (as defined by . . . [section] 21311(b)) files a direct contest . . . alleging the invalidity of this [t]rust or any one or more of its terms."

The trial court found "there was a reasonable likelihood that the requested relief would be granted," and Norina failed to prove a lack of probable cause. As support for its finding, the court noted "evidence that Asuncion's mental capacity had diminished," including Dr. Wood's expert testimony at trial concerning Asuncion's problems with " 'executive functioning,' " Dr. Yonebayashi's medical examination notes from December 2014 documenting " 'moderate cognitive impairment,' " and Norina's own statements in the record noting Asuncion's mental decline as early as 2008 and her forgetfulness in spring of 2014. In addition, the court found there was a reasonable likelihood that Annabelle could have prevailed on her claims of undue influence and elder financial abuse, given the evidence that "Norina had a close relationship with Asuncion and assisted in managing her health and financial affairs; [] Norina had actively

---

[23] Citing *Uzyel*, Norina submits that because the determination of probable cause to contest a trust amendment is objective, it is properly reviewed under a de novo standard. We decline to rely on the cited language, which does not pertain specifically to probable cause within the meaning of section 21311, but rather addresses the standard for an award of attorney fees under section 17211, subdivision (b), regarding a trustee's opposition to a beneficiary's contest of an account " 'without reasonable cause.' " (*Uzyel*, *supra*, 188 Cal.App.4th at p. 926.)

participated in the drafting of [Asuncion]'s 2015 estate documents; [] the outcome of the estate documents favored her interests to the detriment of Sandy and Annabelle; and [] Asun[c]ion had exhibited possible signs of declining mental capacity."

Norina argues the trial court erred by "applying the probable cause standard retrospectively, not objectively." (Underscoring & capitalization omitted.) She contends the court erred in relying on information and evidence that was unknown to Annabelle "at the time of filing" the trust contest. (§ 21311, subd. (b).) She also maintains that because the objective "reasonable likelihood" standard accounts for the relevant law, the facts known to Annabelle at the time of filing the contest needed to be sufficient to overcome the presumptions governing testamentary capacity. The relevant law includes the presumption that a person who suffers from a cognitive disorder may still have the capacity to execute testamentary documents. (§ 810, subd. (b); *Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 727.) Norina contends that given the "heavy burden" (*Doolittle*, *supra*, 241 Cal.App.4th at p. 545) on Annabelle to prove that Asuncion lacked capacity to execute the document or did so under undue influence, the facts known to Annabelle when she filed the trust contest were wholly inadequate to support a reasonable belief that she would obtain relief.

We disagree. Under the substantial evidence standard, the evidence in the record—even when strictly limited to that information known to Annabelle at the time she filed the trust contest—was sufficient to support the trial court's probable cause finding. Annabelle testified that when she reconnected with Asuncion in October 2016, Asuncion "wasn't at all capable of holding a conversation" and was "mostly checked out." In May 2018, after Asuncion's death and upon receiving the 2015 estate documents, some apparent discrepancies emerged, including that Asuncion's June 2015 declaration in support of the 2015 petition stated that she and Rafael never considered the Printempo property an asset of theirs when, in fact, it was expressly listed on the asset list for the 1994 trust. Asuncion's misunderstanding of the assets listed in the 1994 trust

supports a reasonable inference that she may not have had the mental capacity when she signed the June 2015 declaration to "[u]nderstand and recollect the nature and situation of" her property (§ 6100.5, subd. (a)(1)(B)).

Other information obtained by Annabelle prior to filing the trust contest further provided some evidence that Asuncion had suffered cognitive decline for several years. This evidence included Norina's June 2018 e-mail stating that she and Carolina started helping Asuncion manage her checking account as early as 2010, Dr. Yonebayashi's 2014 physician's report (which Annabelle reviewed in June 2018) stating that Asuncion was " 'able to answer value questions appropriately, and *with help of family*, can make her wishes clear' " (italics added), and Asuncion's death certificate which listed a clinical diagnosis of " 'Alzheimer's dementia' " with a period of time of " '[y]ears.' "

When Annabelle subsequently requested a copy of Asuncion's medical records, Norina refused to provide them to her. Norina's refusal to provide Annabelle with their mother's medical records in August 2018 supports an inference that a person in Anabelle's position might reasonably believe that the "opportunity for further investigation or discovery" (§ 21311, subd. (b)) related to Asuncion's dementia would reinforce the likelihood that the requested relief would be granted.

Viewing the evidence in the light most favorable to Annabelle and drawing every reasonable inference in support of the judgment (*Gomez*, *supra*, 54 Cal.App.5th at p. 1026), a person standing in Annabelle's shoes could reasonably believe that she would likely be granted the requested relief in contesting the validity of the 2015 trust amendments "after an opportunity for further investigation or discovery." (§ 21311, subd. (b).) Moreover, as the party seeking to enforce the no contest clause, Norina bore the burden of proof at trial to show that Annabelle brought her trust contest *without* probable cause. (*Key v. Tyler* (2019) 34 Cal.App.5th 505, 531; see 21311, subd. (a) ["A no contest clause shall only be enforced against . . . [¶] (1) [a] direct contest that is brought without probable cause."].) Thus, on appeal from a determination of failure of

64

proof at trial, the reviewing court must consider " 'whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*Almanor*, *supra*, 246 Cal.App.4th at p. 769.)

Norina proffers numerous facts in support of her argument that at the time Annabelle filed the trust contest, a reasonable person *could not believe* that a contest of the 2015 restatement and first amendment would be reasonably likely to succeed, given the numerous safeguards and protections Asuncion utilized in 2015 to insulate the trust amendments from challenge. Norina points to, among other items, two physician reports signed under penalty of perjury asserting that Asuncion was competent to handle her financial affairs and estate planning, that Asuncion was represented by counsel in filing the 2015 petition and executing the 2015 estate documents, and that the court in 2015 had found in its order granting the 2015 petition that Asuncion "is legally competent and authorized to amend" the trust articles set forth in the first amendment.

That Asuncion had engaged the assistance of counsel and obtained instructions from the probate court confirming her capacity to execute the 2015 estate documents cuts against the likelihood that the requested relief would be granted. However, it does not negate or eliminate the substantial evidence supporting the finding that, under an objective standard, a reasonable person standing in Annabelle's shoes and knowing the information available to her in 2018 would have believed that she had at least "a reasonable likelihood that the requested relief w[ould] be granted after an opportunity for further investigation or discovery." (§ 21311, subd. (b).) That there is " 'substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment.' " (*Gomez*, *supra*, 54 Cal.App.5th at p. 1043.) We decline to reweigh the evidence or substitute our judgment for that of the trial court in assessing credibility of the witnesses in relation to the information they had before Annabelle's filing of the trust contest or the reasonable inferences that might be drawn from that evidence.

Norina further contends that there are three no contest clauses at issue (contained in the 1994 trust, the restatement, and reaffirmed in the first amendment), which together operated to disinherit Annabelle and Sandy from the survivor's trust as well as from the bypass trust. She argues that Annabelle and Sandy "directly contested trust documents encompassed by the three no contest clauses." However, our conclusion that the trial court's probable cause finding is supported by substantial evidence in the record based on the facts known to Annabelle at the time she filed the trust contest applies equally to Norina's no contest claim under all of the applicable no contest clauses.

Furthermore, Norina does not assert any basis solely applicable to Sandy upon which to apply the no contest clauses to him under the applicable probable cause standard. The reasons Norina cites, in arguing that Annabelle lacked probable cause based on the information she had when she filed the trust contest, provide no basis from which to infer that Sandy was not privy to the same information. Norina has forfeited any independent basis to claim lack of probable cause as to Sandy.

We further reject Norina's argument that the trial court should have found Sandy was disinherited due to his admissions. Norina correctly notes that the probate court granted her motion to compel and deemed her requests for admission admitted against Sandy. She contends that Sandy thus admitted that in executing his declaration, he " 'lacked probable cause to contest' " both the restatement and the first amendment in violation of the no contest clause.

This argument fails to distinguish admissions of fact subject to judicial admission from mixed questions of law and fact. "Judicial admissions are admissions of fact that 'may be made in a pleading, by stipulation during trial, or by response to request for admission.' [Citation.] 'Facts established . . . as judicial admissions " 'are conclusive concessions of the truth of those matters, are effectively removed as issues from the litigation, and may not be contradicted . . . by the party whose [admissions] are used against him or her.' " ' [Citation.] But 'judicial admissions involve facts, not legal

66

theories or conclusions.' " (*BMC Promise Way, LLC v. County of San Benito* (2021) 72 Cal.App.5th 279, 285–286; see *Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 452 ["a judicial admission is ordinarily *a factual allegation by one party that is admitted by the opposing party*"]; Code Civ. Proc., § 2033.410, subd. (a).)

Norina contends that Sandy admitted he lacked probable cause to contest the relevant trust amendments. However, in granting Norina's motion to compel, the probate court properly limited its "deemed admitted" order to the "*facts* contained in the requests for admission." (Italics added.) The existence of probable cause is a mixed question dependent on the application of law to underlying facts. We decline to construe the admission of what is effectively a mixed factual-legal conclusion as a binding judicial admission. (See *Castillo v. Barrera* (2007) 146 Cal.App.4th 1317, 1324; *Bahan v. Kurland* (1979) 98 Cal.App.3d 808, 812.) Sandy's deemed admitted admissions therefore do not constitute evidence that he lacked probable cause to "contest" the trust by signing his declaration in the case.

We therefore reject Norina's challenges to the trial court's findings on the no contest clauses.

*G. Surcharge Against "Difficult Beneficiaries"*

Norina contends that the trial court applied the incorrect standard in denying her request to surcharge Annabelle's and Sandy's beneficial interest in the trust. She argues that the court erroneously applied a " 'probable cause' " or " 'bad faith' " standard rather than the standard for surcharge articulated in the " 'difficult beneficiary' " provisions of the restatement, set forth in the restatement exhibit titled " 'Trustor's General Clarifications' "[24] (hereafter, the "restatement exhibit").

---

[24] The full title of the restatement exhibit containing the "difficult beneficiary" provisions is "Trustor's General Clarifications Regarding the Service and Indemnification of an Individual Trustee and General Deduct[i]bility of Costs from Difficult Beneficiary's Share." (Italics, underscoring & some capitalization omitted.)

67

### 1. Additional Background

The 2015 restatement contains a no contest clause providing for the disinheritance of any beneficiary under the trust who, without probable cause as defined in section 21311, subdivision (b), challenges the validity of the trust. The no contest clause provides that expenses to defend against any contest under the no contest provision shall be paid from the trusts "as expenses of administration." It does not otherwise address costs or fee-shifting. Instead, it refers to the restatement exhibit, which it states is "incorporated herein as an [e]xhibit[ ] . . . [and] which shall be part of this [t]rust [a]greement."

The restatement exhibit is a five-page document initialed and signed by Asuncion. It addresses the trustor's intent that the role of the appointed trustee in administering or settling the trust estate be "as trouble free as possible on any individual trustee." It identifies the trustor's concern that "one or more beneficiaries hereunder may challenge the conduct of a fiduciary as a means of attempting to influence [or defeat] the fiduciary's exercise of discretion." The restatement exhibit provides that "extraordinary, disproportionate, or unreasonable costs, time, or problems caused by a beneficiary should not be charged against all beneficiaries but rather justifiably should be charged solely against the difficult or 'problem-causing' beneficiary.' Therefore, when a clause in this trust (or any trusts created herein) states that a beneficiary shall be 'liable and specifically charged' it shall mean that such charge, expense, etc. associated with the relevant, discussed or specified beneficiary's acts or omissions shall first be charged against and directly deductible from said beneficiary's share of the trust estate and the beneficiary's share of any trust or beneficial interest created by this instrument (and not as a general expense chargeable to the entire trust estate until said beneficiary's entire beneficial interest in all trusts has been fully exhausted and depleted)." (Boldface omitted.)

The restatement exhibit imposes the specified "charges and liabilities" (boldface omitted) (hereafter, the surcharge) in all circumstances where the trustee must respond to

beneficiaries "other than in the normal course of administering the trust," unless there is "clear and convincing evidence that a trustee was materially mistaken, grossly negligent, fraudulent or acting in bad faith."[25]  It also expressly indemnifies the fiduciary/trustee, in the absence of clear and convincing evidence of intentional misconduct or gross negligence, for any liability or costs resulting from acts or omissions taken on behalf of the trust, as well as for litigation expenses, including attorney fees.

The trial court denied Norina's surcharge claim by referring to the standard for an award of attorney fees and costs in a contest of accounts.  It stated, "In a contest of accounts, the court may award attorney fees and costs incurred to defend the account if the court determines that the contest was in bad faith or without probable cause under Probate Code section 17211."  The court also found, for the "same reasons indicated" in its denial of enforcement of the no contest clause, that "Annabelle had probable cause and did not operate in bad faith by filing her contest."

2. Analysis

We conclude the trial court applied the wrong framework to the extent it relied on the statutory standard under section 17211 for a court's discretionary award of attorney fees and costs in a contest to a trustee's account.[26]  Norina's request for an order for attorney fees and costs, imposed as a surcharge against Annabelle's and Sandy's

---

[25] This clause states in full:  "It is not the Trustor's intent, nor shall any individual trustee/fiduciary be required to respond to beneficiaries (other than in the normal course of administering the trust and according to the standards set forth in this instrument) or be subjected to harassment or other undue difficulty or lack of cooperation from such beneficiaries.  If it cannot be demonstrated by clear and convincing evidence that a trustee was materially mistaken, grossly negligent, fraudulent or acting in bad faith then the challenging, difficult, demanding, or harassing beneficiary shall be 'liable and specifically charged' for costs attributable to responding to the beneficiary."

[26] Section 17211, subdivision (a), authorizes an award of attorney fees and costs when a beneficiary who "contests the trustee's account" did so "without reasonable cause and in bad faith."  (§ 17211, subd. (a); see, e.g., *Uzyel*, *supra*, 188 Cal.App.4th at p. 924.)

69

beneficial interests in the trusts, was not based on a contest to the trustee's account but on the "difficult beneficiaries" provisions set forth in the restatement exhibit.

Nevertheless, we decide that Norina has not shown reversible error because the restatement exhibit falls under the statutory definition of a no contest clause. We have already decided the trial court did not err in denying enforcement of the no contest clause. Further, we conclude to the extent the restatement exhibit applies a standard more stringent than the statutory standard for a direct contest brought without probable cause, it is not enforceable.

a. Construction of Restatement Exhibit

The construction of a trust instrument is generally a question of law. (*Städel Art Museum v. Mulvihill* (2023) 96 Cal.App.5th 283, 293.) The language of the restatement exhibit is convoluted, but it nevertheless reflects a clear intent by the trustor to ensure that "extraordinary, disproportionate, or unreasonable costs, time, or problems caused by a beneficiary should not be charged against all beneficiaries but rather justifiably should be charged solely against the difficult or 'problem-causing' beneficiary.' " (Boldface omitted.)

We construe this introductory language as delimiting the circumstances under which a beneficiary's conduct might warrant a surcharge against the beneficiary bringing the challenge—namely, by asserting contests or challenges that cause extreme, disproportionate, or unreasonable costs or problems for the trustee. This language must be considered together with the "clear and convincing" standard set forth in the other provisions of the restatement exhibit.

Reading the language of the restatement exhibit as a whole, we decide the standard for surcharge under the trust instrument is whether the challenge causes the trustee to incur "extraordinary, disproportionate, or unreasonable costs, time, or problems." (Boldface omitted.) If it does, the challenger is subject to a surcharge against his or her

beneficial interest for any challenge or contest that does not establish by clear and convincing evidence willful misconduct or gross negligence by the trustee.

　　　　b.　Statutory Analysis

Section 21311, subdivision (a)(1) provides in relevant part, "A no contest clause shall only be enforced against . . . A direct contest that is brought without probable cause." "Section 21310, subdivision (b) defines a 'direct contest.' The definition includes a 'contest that alleges the invalidity of a protected instrument or one or more of its terms' based upon the 'revocation of a trust pursuant to [s]ection 15401.' (§ 21310, subd. (b)(5).) 'Contest' is defined as 'a pleading filed with the court by a beneficiary that would result in a penalty under a no contest clause, if the no contest clause is enforced.' (§ 21310, subd. (a).) A 'pleading' is further defined as a 'petition, complaint, cross-complaint, objection, answer, response, or claim.' (§ 21310, subd. (d).)" (*Key v. Tyler* (2019) 34 Cal.App.5th 505, 517.) "If an instrument contains a no contest clause that is inconsistent with the revised law, the clause will be disregarded." (*Giammarrusco v. Simon* (2009) 171 Cal.App.4th 1586, 1615 (*Giammarrusco*).) Section 21314 provides that the statutes related to no contest clauses apply "notwithstanding a contrary provision in the instrument." A no contest clause is defined as "a provision in an otherwise valid instrument that, if enforced, would penalize a beneficiary for filing a pleading in any court." (§ 21310, subd. (c).)

The restatement exhibit falls within the definition of a " '[n]o contest clause' " under section 21310, subdivision (c). Further, the restatement exhibit applies a more stringent standard than a "direct contest that is brought without probable cause" that defines an enforceable no contest clause. (See § 21311, subd. (a).) According to its terms, the restatement exhibit directs that a surcharge should be applied to any challenge or contest that does not establish by clear and convincing evidence willful misconduct or gross negligence by the trustee. The restatement exhibit is also a " '[p]rotected

71

instrument' " (§ 21310, subd. (e)(2)) within the meaning of a " '[d]irect contest' " (*Id.*, subd. (b)), and is thus subject to the enforcement provisions of section 21311.

We decide that Annabelle's petition amounted to a " '[d]irect contest' " within the meaning of section 21310, subdivision (b). We further conclude that the standard set forth in the restatement exhibit does not fall within the definition of an enforceable no contest provision under section 21311, subdivision (a)(1). We have already rejected Norina's challenges to the trial court's findings on the no contest clauses. To the extent the restatement exhibit applied a different standard, it is not enforceable. (§ 21314; *Giammarrusco*, *supra*, 171 Cal.App.4th at p. 1615; see also *Aviles v. Swearingen* (2017) 16 Cal.App.5th 485, 492.) The trial court therefore did not err in its decision not to surcharge Annabelle and Sandy.

### H. Application of the No Contest Clause to Sandy

Norina contends that, despite receiving timely notice of the trial, Sandy did not appear at trial and judgment should have been entered against him. She asserts that the trial court should have disinherited Sandy based on his violation of the no contest clause and surcharged his interest in the trusts "up to their full extent."

Annabelle responds that the trial court properly differentiated between Sandy's default and the court's finding that Annabelle—and by extension, Sandy—had probable cause to file the trust contest. Annabelle argues that the court appropriately declined to enforce the no contest clause against Sandy who, in any event, is not a proper party to the litigation because he did not contest the trusts and was not properly served with Norina's amended petition against him.

It is undisputed that Sandy was not a party to the trust contest or petition for accounting filed by Annabelle. Nor is he a party on appeal. As described *ante*, Sandy's declaration filed by Annabelle in 2019 stated that Sandy had not received a copy of the 2015 petition or related order and asked that the court set aside the 2015 petition and the resulting order. The probate court subsequently granted Norina's request for leave to

72

amend her petition to enforce the no contest clause, and for surcharge, against Sandy. After denying Annabelle's motion in limine seeking to dismiss Sandy from the case for lack of jurisdiction over him, the trial court ruled that notice to Sandy was proper and that he had failed to respond to Norina's amended petition. The court signed the entry of default as to Sandy, stating that it was "solely in regard to [Sandy] and the fact that he did not respond after being properly served."

On this record, we conclude that Norina has not shown error in the trial court's decision not to enforce the no contest clauses against Sandy, notwithstanding the entry of default for his failure to appear at trial. As support for her contention, Norina relies on the trial court's finding at trial that Sandy was properly served with 15-day notice of the trial, and on the general proposition that a party's non-appearance at trial, where notice of trial has been timely given, is akin to default and results in a loss by the nonappearing party. These assertions, without more, fail to satisfy Norina's burden on appeal to overcome the presumption of correctness and show prejudicial error. (See *Denham*, *supra*, 2 Cal.3d at p. 564.)

Specifically, Norina asserts that Sandy's nonappearance at trial required the court to enter judgment against him. She cites *In re Marriage of Goddard* (2004) 33 Cal.4th 49, 58 for its recitation of the rule that nonappearance at trial after proper notice results in default. *Goddard* confirms the general principle that " ' "[a] proceeding taken against [a party] in his absence is in the nature of a default." ' " (*Ibid*.) However, it does not address how an entry of default affects the specific claims and remedies requested at trial. Where, as here, the trial court rejected the factual predicate (lack of probable cause) for a finding in favor of the claim to enforce the no contest clause, and Sandy's pleading in purported contest of the trust consisted solely of a declaration asserting that he never received notice of the 2015 restatement and first amendment, the proper scope and effect of the default is particularly unclear.

73

Further, Norina did not object to the trial court's proposed statement of decision on this ground. It is well settled that a party who fails to bring perceived deficiencies in a proposed statement of decision to the trial court's attention "waives his right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment." (*Arceneaux*, *supra*, 51 Cal.3d at pp. 1133–1134.) In addressing the court's tentative ruling on enforcement of the no contest clause, Norina addressed only Annabelle's alleged lack of probable cause to contest the trust and thus waived her right to claim on appeal that the statement of decision was deficient for failing to impose the disinheritance penalty on the basis of Sandy's nonappearance at trial. Drawing all intendments in favor of the trial court's ruling (*Arceneaux*, at p. 1133; *Denham*, *supra*, 2 Cal.3d at p. 564), we conclude that by refusing to enforce the no contest clause against Sandy, the court implicitly found the entry of default for Sandy's nonappearance at trial was an insufficient basis to enforce the disinheritance penalty for a contest filed without probable cause.

## III. DISPOSITION

The judgment is affirmed.

_____
                              Danner, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

_____
Bromberg, J.

**H050098**
*Jinkins v. Sharpe*